IN THE MATTER OF THE APPLICATION OF DONALD G. MATTHEWS FOR ADMISSION TO THE BAR OF NEW JERSEY.

Argued June 16, 1983—Decided July 21, 1983.

*Bernard F. Conway* argued the cause for Donald G. Matthews (*Stern, Steiger, Croland & Bornstein,* attorneys; *Bernard F. Conway* and *Jay D. Rubenstein,* on the brief).

*Colette A. Coolbaugh,* Assistant Director, argued the cause for Division of Ethics and Professional Services (*Colette A. Coolbaugh,* attorney; *Harold L. Rubenstein,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The issues raised by these proceedings concern the standards for evaluating the fitness of a bar applicant to practice law and the procedures that must be followed in determining the candidate's fitness.

The individual whose application for admission to practice law has occasioned these proceedings is Donald Matthews. While in law school, Matthews was involved in a fraudulent investment scheme that eventually resulted in civil litigation by defrauded investors against Matthews and his partner. This unlawful venture also led to criminal proceedings against his partner, resulting in the partner's conviction and imprisonment. Matthews has maintained that he was deceived by his partner and that throughout his involvement he believed in good faith in the legitimacy of the investment scheme for which he solicited funds.

Initially, a designated part of the Committee on Character concluded that Matthews had knowingly participated in the investment fraud, demonstrated a serious lack of understanding

of the enormity of his misdeeds and displayed little, if any, remorse. Accordingly, it recommended that Matthews be denied admission to the bar for lack of the required good moral character. Matthews appealed this determination to a Hearing Panel of the Committee on Character, which, following a formal hearing, found that although Matthews should have known of the fraud, the evidence was insufficient to prove Matthews had actual knowledge. The Committee concluded that while Matthews' misconduct had been serious, his character had changed over the six intervening years, and that the six-year delay in admission had been sufficient discipline. Accordingly, on November 1, 1982 the Committee certified to the Board of Bar Examiners that Matthews was fit to practice law. Upon initial review of the certification, we issued an order to show cause in order to review the Committee's certification of Matthews' fitness to practice and to determine whether he should be admitted to practice law.

I

The heart of this matter concerns Matthews' relationship and business dealings with Ralph Cucciniello. In the late summer of 1973, as Matthews prepared to enter law school, Cucciniello offered Matthews the opportunity to enter into an extraordinarily profitable investment scheme. Cucciniello who was a social acquaintance of Matthews told Matthews that he had an opportunity to invest in some land deals that promised to yield a return greater than 40 percent on a term of merely four to six weeks. Matthews' understanding of the structure of these deals was that the money was being used to purchase property in Ocean County that the purchasers already had contracted to sell to another party at a tremendous markup, so that the profit was virtually guaranteed. Although Cucciniello was actually younger than Matthews and was similarly a law student without significant business experience, Matthews felt that the investment scheme was credible and, in September 1973, decided to invest.

Matthews made two investments in September, totalling approximately $1250. Subsequently, Cucciniello told Matthews that the deal had gone through and that his money had accrued the indicated profit. Cucciniello also indicated to Matthews that another similar transaction was planned and that Matthews could let Cucciniello retain his initial investment and profit and roll it over into this second deal. Matthews agreed and also gave Cucciniello another $600 to invest. The second deal being planned by Cucciniello was indeed similar to the first. However, neither deal involved any land transactions. Instead, Cucciniello was operating a classic, pyramid-style investment fraud known as a "Ponzi" scheme. In this type of scheme, no investment is ever made. Instead, the promised returns for the first set of investors are paid from the proceeds garnered from a second set of investors. The second set of investors is then paid off with the funds deposited by a third set of investors, and so on. At each step of the process, the promoter takes a sizeable cut as pure profit. The scheme creates irresistible pressure to bring in additional investors with ever greater amounts of money, and eventually collapses of its own weight when the supply of fresh investors dries up.

By October 1973, when Matthews rolled over his money into the second deal, he had become an active partner of Cucciniello in the solicitation of new investors. Cucciniello at that time asked Matthews if he knew anyone else who would be interested in investing in the deal, and Matthews proceeded to solicit funds from his personal friends for both the second deal and a series of subsequent similar transactions. These deals were structured in the same way as the first one in which Matthews had participated, with extremely high yields promised in a matter of four to six weeks. For his role in solicitation, Matthews received part of the profit. On a deal that Cucciniello said would yield a 40 percent return, Matthews kept 20 percent and the investors received a 20 percent profit.

The first of the deals for which Matthews solicited ended in November 1973. As with the succeeding deals, the investors were told that they could roll over their initial funds, along with accrued profit, into the next deal, and some evidently did so. In all, four deals occurred between the fall of 1973 and the fall of 1974 for which Matthews helped solicit investors. Over $500,000 was collected, with Matthews responsible for solicitations totalling over $100,000. Matthews has admitted to profits of at least $33,000 from his activity. These figures may be conservative, because many of the investments and repayments were in cash. No records were kept on cash transactions, and neither Matthews nor Cucciniello maintained a book of accounts.

Throughout all of these deals, Matthews claims to have relied totally on Cucciniello's representations. Matthews did have real estate experience, having received a real estate salesman's license and having worked in his father's real estate office. Nevertheless, he later stated that he did not think it was unusual to receive a guaranteed 40 percent return for short-term participation in a realty investment, although he had never before seen such a transaction. Matthews never looked at any of the sales contracts supposedly involved, never talked to any of the people supposedly purchasing the property, and never went to look at the property. He claims that his reliance on Cucciniello was total.

By December 1973, Matthews and Cucciniello began discussing the formation of a corporation through which investments would be funneled. Together they set up the corporation in early 1974 under the name "Rado," which stood for Ralph and Don, their first names. Matthews and Cucciniello were the sole directors and shareholders of Rado, each owning half of the corporation. A bank account was established for Rado and, by the summer of 1974, some of Matthews' and Cucciniello's investment activities were carried on through Rado, although some funds continued to be collected and disbursed through their personal checking accounts.

The level of Matthews' involvement can be seen in a transaction that he and Cucciniello conducted with Dr. John Rodgers and his wife, who were relatives of Cucciniello. Matthews accompanied Cucciniello to the Rodgers home, where the proposed deal was explained to Dr. Rodgers. Matthews and Cucciniello cosigned on a $70,000 note given to Rodgers as a further guarantee for the money Rodgers was investing. Although Matthews ostensibly thought Rodgers was investing in a land deal, two checks were made out directly to Matthews, who used these to pay off prior investors. Similarly, in a later transaction, Matthews had another investor write a $16,000 check payable to Dr. Rodgers. Matthews' later explanation of these events was that Cucciniello told him the money was "backed," and that this was simply a quicker way of paying off earlier investors, rather than waiting for proceeds from the deals that had just concluded to clear the banks. To Matthews, the arrangement simply appeared "expeditious."

The last investment scheme for which Matthews solicited outsiders began in August 1974 and continued on through the end of the year. This deal purportedly involved a $3 million certificate of deposit, issued through the Chase Manhattan Bank and the Bank of Luxembourg, that Matthews thought would yield over 40 percent on a six-month term. Matthews and Cucciniello were to raise $500,000 of the required amount, while the remainder was to be raised by a wealthy individual whom Cucciniello knew and who supposedly had arranged for the certificate. As with the land deals, Matthews' understanding of the mechanics of the C.D. deal was weak. He later testified that all he knew was that it was "some kind of a deal with oil through the Bank of Luxembourg." Matthews said that he and Cucciniello asked a friend who was a lawyer to look into it, and that this friend reported he could find no evidence of the existence of such a deal. Nevertheless, whatever skepticism Matthews felt was abated by Cucciniello's reassurances, and

Matthews went about his solicitations.[1]

By the end of 1974, the availability of new money came to an end and pressure from investors for repayments mounted. The last profit taken by Matthews was $5,000 he received from Cucciniello on January 20, 1975. At this time Cucciniello and Matthews were negotiating to purchase a trailer court in Butler with Rado profits. The closing was scheduled for January 14, 1975, but did not occur because Cucciniello had failed to bring the necessary funds. Despite assurances that he would raise the money, Cucciniello failed to do so within the next two weeks.

Matthews at this point apparently lost confidence in Cucciniello. On January 30, 1975 he filed a complaint in the Chancery Division in Bergen County alleging that he and Cucciniello "were associated in the business of securing funds for third parties for the purpose of real estate finances" and that Cucciniello owed Matthews money given him by Rado and Matthews. Matthews sought and was granted an order enjoining Cucciniello from disposing of or transferring any real or personal property and requiring Cucciniello to deposit into the court both his personal financial records and those of Rado. Later, in June 1975, Matthews amended his pleadings to include claims on

---

[1]Matthews also had dealings with Cucciniello concerning the purchase of liquor at discount. Cucciniello told Matthews he could get a 35 percent rebate on large liquor purchases through a dealer he knew. Matthews bought over $5,000 of liquor through this arrangement and testified that he sold most of it to friends, explaining that he passed the discount on to them and thus did not make any profit. These transactions came to the attention of the Committee but they did not contribute materially to its assessment of Matthews' character. Similarly, we acknowledge the relevance of these circumstances to an overall appraisal of Matthews' fitness to practice law, but see no need to attribute any special significance or added weight to this evidence in view of the conclusions reached in this opinion.

Matthews also received other items through Cucciniello at a discount, including a stereo, a camera and a trip to St. Thomas. Matthews told the Hearing Panel that after his relationship with Cucciniello broke off, he discovered Cucciniello had paid full price for the vacation trip and had done the same thing with some of his relatives. Matthews surmised that this was Cucciniello's way of ingratiating himself with others.

behalf of third parties whose funds he had solicited and turned over to Cucciniello. A deluge of complaints by other investors followed after Matthews sued Cucciniello. Of these suits, two named Matthews as a defendant, and Rado was named as a defendant in these suits as well as in a third. These complaints were consolidated with a number of complaints in which Cucciniello was the sole defendant.

Trial began on November 12, 1975 and, after several delays, was concluded in April 1976. Although the trial did not focus on Matthews' knowledge and underlying intent, the court concluded that it was "clear beyond peradventure" that Matthews was "a full-fledged co-conspirator" with Cucciniello, and found that Matthews and Cucciniello were jointly and severally liable for nearly $500,000 in claims. The trial judge clearly did not believe Matthews' claim that he had been duped by Cucciniello for over a year. As evidence of Matthews' knowledge of the fraudulent nature of the deals, the court pointed to Matthews' presence at the solicitation of Dr. Rodgers, his co-signing of the investment guarantee, and his personal receipt of at least $11,000 from Dr. Rodgers at that time.

While Matthews' appeal of the court's decision was pending, he was graduated from law school and applied to take the July 1976 bar examination. Matthews' certified statement to the Committee on Character,[2] filed as part of his bar application, discussed the pending legal proceedings and also noted that criminal fraud charges had been brought against Cucciniello by the Bergen County Prosecutor's Office.[3] Matthews' application

[2]Candidates for admission to the bar are required to submit a Certified Statement to the Committee on Character. RG.201:1. The Statement elicits a candidate's personal history upon which the Committee relies heavily in its initial review of a candidate's fitness to practice law.

[3]The Bergen County Prosecutor had investigated the case with the intent of obtaining an indictment that included Matthews, but had found insufficient evidence to indict Matthews. In response to a letter from the Committee on Character the prosecutor conceded that it "seems incredible" that Matthews

was reviewed and investigated by Part II of the Committee on Character. Included in the record before Part II was an affidavit taken from Cucciniello in March 1977, in which he stated that Matthews had been his partner and "had full knowledge of everything that was done." On April 19, 1977 the Committee formally advised Matthews of its intent to withhold certification and of his right to a formal hearing pursuant to RG.303:4. However, the hearing was initially postponed because of the hospitalization of Matthews' attorney.

On April 13, 1978 the Appellate Division issued a *per curiam* opinion in Matthews' appeal, remanding the case for a new trial. The court found that the trial court had unfairly converted the proceedings into a trial that subjected Matthews to broad liability for a cause not clearly delineated in the pretrial order and to persons who had not sued him. The Appellate Division further found that the trial court had arbitrarily and improperly prevented Matthews from testifying in his own behalf as a defendant. Following the Appellate Division's remand, five parties asserted claims against Matthews. Matthews ultimately settled with these claimants and with others whom he had solicited but who had not filed suit. His total liability came to slightly more than $40,000, some of which is still being repaid.

On October 30, 1980 Part II of the Committee on Character advised Matthews that an informal conference would be scheduled at which Matthews could present his case.[4] In preparation

---

had been taken in by Cucciniello, but pointed out that others were similarly duped, that those who had been involved with Matthews believed he had been duped, and that there were numerous instances where Cucciniello had concealed activities from Matthews. The prosecutor concluded that Matthews showed "extremely poor judgment and engaged in activities bordering on criminal negligence," but "was not, at least beyond a reasonable doubt, guilty of any criminal activity."

[4]A party may hold a conference whenever it deems one necessary. The Character Committee's regulations state that "[r]easons for a conference could include, but would not be limited to, a record of conviction of a crime,

for the conference, Matthews submitted various financial and legal documents, including his tax returns. Also among Matthews' submissions was an update of his Certified Statement, which included several new letters of recommendation from various attorneys.[5]

The first area discussed at the conference held on February 4, 1981 was Matthews' failure to file timely income tax returns for 1973, 1974 and 1975. Matthews' updated Statement had noted unsatisfied debts to the I.R.S. for tax, penalty and interest amounting to $6,105 in 1974 and $484 in 1975. Part II questioned how Matthews could have purchased a $7,000 Porsche, taken vacations to the Virgin Islands and Vermont and treated his parents to a vacation trip—all of which he concededly did while he was a law student—and yet thought he had no income and need not file tax returns. Matthews explained that when he learned in early 1975 that the investments were illegal and restitution would probably be required, he believed that he was not required to report any income.

The Committee also repeatedly reminded Matthews that it wanted to know what he would have added to his trial testimony to establish his claim of unknowing participation. Matthews said that investors' funds had been solicited in the good faith belief that Cucciniello was investing in high return "sure things," that he did not see anything suspicious in the way funds were handled, and that, as far as he was concerned, he had done

evidence of conduct involving moral turpitude, evidence of mental illness or psychological disorder or lack of full disclosure by the candidate." RG.303:3.

[5]On February 2, 1981, Part II received a letter from the trial judge, written at the request of Matthews' attorney. The judge stated that, given the report from the Bergen County Prosecutor's Office and the Appellate Division's opinion, his findings should be deemed withdrawn and not considered by the Committee on Character. In a meeting with two Committee members, the judge explained that he believed his findings were not binding upon the Committee as a matter of law. Nevertheless, the judge indicated that he held to the view that Matthews' participation in the investment fraud had been knowing.

nothing wrong other than fail to keep better records. Matthews' written statement explained that he initially had complete faith and trust in Cucciniello, and this trust was reinforced by the fact that at the end of the summer in 1974 all investors solicited by Matthews had been repaid their initial stake plus profit, except for one who chose to roll over his money into the certificate of deposit.

Five of the seven members of Part II concluded that "even if Matthews were first unaware of the fraud, its scope and duration were such that he fully knew he was involved in unsavory, improper and illegal activities." These members also found, of necessity, that Matthews had failed to discuss candidly with them his participation in the investment scheme. The majority stated, however, that the commission of such acts would not necessarily bar admission to the bar, since evidence of rehabilitation is always considered. Nevertheless, it found that Matthews "demonstrated a serious lack of understanding of the enormity of his misdeeds and displayed little, if any, remorse." It thus concluded that Matthews did not meet the moral and ethical standards required for admission to the bar.

Two members dissented. One found that Matthews' acts were the result of youthful enthusiasm and avarice and should not now be a bar to admission. The other found Matthews' explanation of his involvement in the investments to be incredible in light of his family business background and level of education, and was concerned that Matthews had neither expressed remorse nor acknowledged responsibility. She, nevertheless, voted to certify on the basis of the passage of time and her belief that Matthews' experience with the bar admission process would deter any future misconduct.

Pursuant to RG.304, Matthews appealed Part II's finding that he was not fit to practice law in New Jersey. The Chairperson of the Character Committee, along with the Chairpersons of Parts I and III of the Committee, sat as the Hearing Panel for the appeal which was heard on March 30 and May 6, 1982. In

its report, dated November 1, 1982, the Hearing Panel unanimously concluded that Matthews was fit to practice law. The following findings were central to its conclusion: (1) The evidence was insufficient to prove that Matthews himself intended to defraud anyone or that he knew others were being defrauded by Cucciniello. The Committee noted that because the civil litigation centered on the validity of investors' claims and only at times related directly to the degree of knowledgeable participation by the various parties, there was a lack of evidence probative of culpability. (2) Matthews should have known from a number of warning signs that investors were being defrauded. Further, Matthews now acknowledged this fact and, in retrospect, would not have participated. (3) Matthews should have given more attention to whether he was obligated to file federal income taxes in 1974 and 1975 and had not explained why he did not make estimated tax payments during 1974 when he then thought he had legitimate income. (4) Notwithstanding his prior culpable conduct, Matthews' character had changed in the intervening six years. The Committee felt that Matthews' moral character had been strengthened by the ordeal of the civil litigation, the criminal investigations, the protracted Character Committee conferences, and the consequential humiliation. The Committee concluded that "the public will not be harmed by his admission as an attorney at this time." The Committee additionally found the six-year delay in Matthews' admission to the bar to be a "substantial sanction" and in itself "sufficient discipline."

The Hearing Panel's report and recommendation were forwarded directly to this Court for final determination.

## II

At the outset, we must address Matthews' contentions that the Court is foreclosed from conducting a definitive review of the merits of his case. He asserts initially that the Court has no legal authority to withhold certification. Matthews argues that

under *R.* 1:27–1 [6] the Court has delegated the examination of a bar applicant's character to the Committee on Character and is bound to admit those applicants whom the Committee has certified as possessing good character. Matthews also suggests that the regulations governing the Committee on Character, approved by this Court, delegate original jurisdiction to determine fitness to the Committee on Character and provide for appellate review by the Supreme Court only when certification has been denied by the Committee on Character. As a result, Matthews claims that this Court does not have jurisdiction to review the Character Committee's certification of his fitness.

We reject this contention. The New Jersey Constitution provides that "The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted." *N.J. Const.* (1947) Art. VI, § II, par. 3. This constitutional authority and the concomitant responsibility to regulate the practice of law in the public interest cannot be delegated in

---

[6] *R.* 1:27–1 reads in full:

Plenary Admission

(a) Qualifications for Licensure. No person shall be admitted to the bar of this State unless the following shall first have successfully occurred in the manner prescribed by the rules of the Board of Bar Examiners:

(1) Passage of the bar examination;

(2) Certification of good character by the Committee on Character pursuant to R. 1:25 and the regulations of that body;

(3) Attainment of a qualifying score on the Multi-State Professional Responsibility Examination or passage of an approved course on professional ethics given by an American Bar Association-accredited law school; and

(4) Completion of the Skills and Methods course required by R. 1:26.

(b) Report of Board to Supreme Court. The Board of Bar Examiners shall report to the Supreme Court the names of those applicants whose qualifications accord with these rules. The Supreme Court shall then admit such applicants as attorneys of this State and administer to them the oaths prescribed by R. 1:27–3. An applicant's failure to appear before the Court and take the oaths within 2 years of the date the applicant sat for the examination shall cause the right of admission on the basis of that examination to lapse.

their entirety to the Board of Bar Examiners, the Committee on Character or any other instrumentality of the Court. Although the current rules do not define a formal procedure for cases like Matthews', the Court has inherent jurisdiction to review any determination concerning an applicant's fitness to practice law. Given the Court's ultimate constitutional authority and its obligation to regulate the practice of law, it retains the authority in all cases to make the final determination of an applicant's fitness to practice law.

Matthews makes an alternative argument that even if the Court retains jurisdiction to review his fitness, the Court sitting as an appellate tribunal must give due deference to the findings of fact, especially determinations concerning credibility, made by the Committee on Character. We are also unable to agree with this suggestion. Normally, great deference is accorded to findings based on testimonial evidence because of the opportunity "to observe the demeanor of witnesses and the character of their testimony[.]" *Siegel v. Committee of Bar Examiners*, 10 *Cal.*3d 156, 110 *Cal.Rptr.* 15, 27, 514 *P.*2d 967, 979 (1973). However, where the same evidence has been heard by more than one trier of fact and contrary conclusions have been reached, the "degree of reliance normally accorded" such findings is discounted. *Id.*, 110 *Cal.Rptr.* at 27–28, 514 *P.*2d at 979–80. Even though we need not in all cases exercise our power to engage in an independent review of the evidence and make original findings, we cannot in this case rely on the conflicting factual determinations below and therefore must conduct an independent review of the record.

Finally, Matthews claims that he was denied procedural due process because the order to show cause does not adequately indicate the grounds upon which the applicant's fitness was to be reviewed. At oral argument, however, counsel conceded that he was fully aware of the issues in dispute and that his client has suffered no prejudice in this regard.

We conclude therefore that this Court has the jurisdiction to review the validity and sufficiency of the certification of the Committee on Character that Matthews has the requisite fitness to practice law, that it is not bound to accept to factual findings of the Committee in evaluating Matthews' fitness, and that in the totality of circumstances the Court's exercise of its jurisdiction in the matter does not deprive Matthews of any constitutional right of due process or equal protection of the laws.

### III

█ The fundamental meritorious question in this case involves the substantive standards governing individual fitness to practice law. It has long and firmly been recognized that the power to determine standards for admission to the bar rests with the individual states. *Konigsberg v. State Bar of Cal.*, 353 *U.S.* 252, 273, 77 *S.Ct.* 722, 733, 1 *L.Ed.*2d 810, 825 (1957). In New Jersey, this power has been constitutionally entrusted to the Supreme Court. *N.J. Const.* (1947) Art. VI, § II, par. 3.

This Court has consistently held bar membership to be a privilege burdened with conditions. *In re Pennica*, 36 *N.J.* 401, 433 (1962). Among the most basic conditions precedent to bar admission are "good moral character, a capacity for fidelity to the interests of clients, and for fairness and candor in dealing with the courts." *Id.* at 434. This requirement was outlined in New Jersey well over a century ago, *On Application for Attorney's License*, 21 *N.J.L.* 345 (Sup.Ct.1848), and has remained an essential prerequisite for bar membership. Our current rules require "fitness to practice law," *R.* 1:25, and "good character," *R.* 1:27–1(a)(2).

Indeed, the requirement that those aspiring to become lawyers must be of good moral character is universally accepted. Although good moral character is an "unusually ambiguous" term which "can be defined in an almost unlimited number of ways," *Konigsberg v. State Bar of Cal., supra*, 353 *U.S.* at 263, 77 *S.Ct.* at 728, 1 *L.Ed.*2d at 819, good moral character has been

the "historic unquestioned prerequisite of fitness,"[6] *Schware v. Board of Bar Examiners,* 353 *U.S.* 232, 248, 77 *S.Ct.* 752, 761, 1 *L.Ed.2d* 796, 807 (1957) (Frankfurter, J., concurring); *see In re Vincenti,* 92 *N.J.* 591, 603 (1983). Some definitions of good moral character are broad and fairly imprecise. *Hallinan v. Committee of Bar Examiners,* 65 *Cal.2d* 447, 55 *Cal.Rptr.* 228, 421 *P.2d* 76, 81 (1966) ("moral turpitude" indicates lack of good character); *In re Alkow,* 64 *Cal.2d* 838, 51 *Cal.Rptr.* 912, 914, 415 *P.2d* 800, 802 (1966) ("everything done contrary to justice, honesty, modesty or good morals," and acts "of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general"); *In re Monaghan,* 126 *Vt.* 53, 222 *A.2d* 665, 671 (1966) (the test is whether "an unsavory, dishonest, debased and corrupt nature" is evident); *Reese v. Board of Comm'rs of Ala. State Bar,* 379 *So.2d* 564, 569 (Ala.Sup.1980) (good moral character defined as the absence of acts or conduct which would prove "moral turpitude"); *Re: G.W.L.,* 364 *So.2d* 454, 458 (Fla.Sup.1978) (lack of good moral character exists when evidence shows "acts and conduct which would cause a reasonable man to have substantial doubts about an individual's honesty, fairness and respect for the rights of others and for the laws of the state and nation."). Other states, while not necessarily adopting a more precise definition, underscore the critical importance of integrity in their understanding of good character. *In re Application of Davis,* 61 *Ohio St.2d* 371, 403 *N.E.2d* 189, 190 (1980) (integrity and honesty are essential); *Application of Allan S.,* 282 *Md.* 683, 387 *A.2d* 271, 275 (App. 1978) (nothing is more important as a moral character qualification than "truthfulness and candor"); *Pushinsky v. West Va. Bd. of Law Examiners,* 266 *S.E.2d* 444, 450 (W.Va.Sup.1980) (the purpose of the good moral character requirement is "to insure that dishonest, unscrupulous or corrupt individuals" will not become lawyers).

We believe that the fitness requirement is best articulated in relation to the state's interests in the regulation of the legal profession. These interests are generally recognized to be two-

fold: first, the protection of prospective clients, and second, the assurance of the proper, orderly and efficient administration of justice. These governmental interests were described by the Florida Supreme Court:

> The layman must have confidence that he has employed an attorney who will protect his interests. Further, society must be guaranteed that the applicant will not thwart the administration of justice. These exigencies arise because the technical nature of law provides the unscrupulous attorney with a frequent vehicle to defraud a client. Further, the lawyer can obstruct the judicial process in numerous ways, e.g., by recommending perjury, misrepresenting case holdings, or attempting to bribe judges or jurors. [*In re Eimers*, 358 *So*.2d 7, 9 (Fla.Sup.Ct.1978) (citation omitted).]

*See also* Special Project, "Admission to the Bar: A Constitutional Analysis," 34 *Vand.L.Rev.* 655, 664 (1981); *Note*, "Admission to the Bar Following Conviction for Refusal of Induction," 78 *Yale L.J.* 1352, 1357–58 (1969). The fitness requirement exacted of all lawyers should be formulated in terms of the qualities of character that attorneys must possess in order to fulfill their obligations to individual clients and to the judicial system. Fitness so defined will meaningfully foster the State's interest in regulating the profession. *See Application of Gahan*, 279 *N.W.*2d 826, 829 (Minn.Sup.1979) (under Rule II of the Rules for Admission to the Bar, character traits are relevant only if they "have a rational connection with the applicant's present fitness or capacity to practice law, and ... relate to the State's legitimate interest in protecting prospective clients and the system of justice.")

Accordingly, we conclude that a bar applicant must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice. These personal characteristics are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly. We also believe that applicants must demonstrate through the possession of such qualities of character the ability to adhere to the Disciplinary Rules governing the conduct of attorneys. These Rules embody basic ethical and professional

precepts; they are fundamental norms that control the professional and personal behavior of those who as attorneys undertake to be officers of the court. These Rules reflect decades of tradition, experience and continuous careful consideration of the essential and indispensable ingredients that constitute the professional responsibility of attorneys. Adherence to these Rules is absolutely demanded of all members of the Bar.

## IV

We must now determine whether and to what extent Matthews' conduct evidenced unfitness to practice law. We are satisfied that unless such evidence of unfitness is clear and convincing, any lingering doubts as to the ability of the candidate to undertake the professional responsibility of a lawyer can be resolved in his or her favor and admission to the bar should be allowed. *See In Matter of Shaw,* 88 *N.J.* 433, 437 (1982).

Although Matthews was deeply involved in the fraudulent scheme at the core of this controversy, those with the obligation to look critically at the facts have reached different conclusions regarding whether Matthews actually knew that the "investments" were fraudulent. The differences in these antecedent factual determinations work to Matthews advantage since we are hesitant to conclude, in our own independent review of the record before us, that Matthews actually knew that a hoax was being perpetrated. If Matthews had actual knowledge of the fraudulent nature of the investment scheme, we would conclude that he is unfit to practice law. His actions undertaken with such knowledge would demonstrate a fundamental lack of honesty and truthfulness, a deep want of trustworthiness and fidelity to those with whom he has entered a business relationship, and a chronic contempt for the administration of justice and the laws that govern the affairs of individuals. It would also evidence an inability and incapacity to conduct himself within the confines of the Disciplinary Rules. See, e.g., DR 1–102(A)(3) (illegal conduct); DR 1–102(A)(4) (conduct involving

dishonesty, fraud, deceit, or misrepresentation); DR 5–104(A) (limiting business relationships by a lawyer with a client).

■ Although we are unable to conclude definitively that Matthews knew of the underlying fraudulent nature of the criminal venture in which he was intimately connected, we nevertheless believe that his involvement demonstrates a lack of fitness to practice law. It cannot be disputed that Matthews should have known of the fraudulent nature of the scheme. Even Matthews, in retrospect, recognizes that too many elements of the scheme simply reeked with illegitimacy. Any reasonable person's suspicion would have been raised by a series of purported investment opportunities, each of which returned an exceptionally high rate of profit, yet involved no risk. Numerous other factors would compound this suspicion. Each deal was called to Matthews' attention by Cucciniello, a young man with no special business expertise or experience who was apparently acting independent of any professional investment firm or real estate agency. The financial transactions, though involving substantial sums of money, required no legal documentation or other financial paperwork. And, on top of all these indicia of fraud, Matthews knew that money received from one investor was being turned over directly to other investors.

Yet, Matthews failed to conduct even a cursory investigation of the nature of these transactions, even though he was one of the two directors of the corporation undertaking this activity and was personally raising thousands of dollars from friends who were relying on his representations that the investment was fail proof. Despite Matthews' background in real estate, he had never heard of the type of incredibly profitable transactions that Cucciniello had uncovered. Nevertheless, Matthews did not seek to view the real estate involved, nor to meet the parties from whom the properties were being bought or to whom they were being sold, nor to review the legal and financial documents surrounding the transactions that his corporation was sponsoring. In the one instance when Matthews did investigate, he was

told by a lawyer that no evidence could be found substantiating the legitimacy of the purported transaction. Yet, Matthews chose to ignore counsel's advice and instead blindly accepted the vague assurances of his business partner.

We believe that this pattern of activity evidences a serious lack of fitness to practice law. Matthews' actions, at the very best, bespeak of avarice, selfishness, extraordinary incredulity, and indifference to the welfare of individuals relying upon him. The nature of Matthews' involvement in this investment venture provides a clear indication that he does not possess the character traits of trustworthiness and reliability required of an attorney to safeguard the interests of clients. His actions also evidence an incapacity to adhere to the high standards of professional conduct imposed by our Disciplinary Rules. See, e.g., DR 5–101 (refusing employment when the interests of the lawyer may impair his independent professional judgment); DR 6–101 (neglect in handling of legal matters); DR 7–101 (zealous representation of client's lawful objectives).

Our conclusion that Matthews is unfit for admission to the practice of law is bolstered by Matthews' failure to file timely federal income tax returns for the years 1973, 1974 and 1975. In order to justify his failure to file returns in 1974 and 1975, Matthews suggests that he erroneously believed he had no duty to file returns for these years because the investment scheme had unraveled and he thought he would be required to return to the defrauded investors any income that he had earned. Whatever the merits of this purported explanation, it does not explain why no return was filed in 1973 and why no quarterly returns were filed over the course of 1974 prior to the collapse of the venture. These events reflect poorly upon Matthews' personal commitment to the proper administration of justice, as well as his honesty and truthfulness, and his ability to conform to the requirements of the Disciplinary Rules. See, e.g., DR 1–102(A)(3) (prohibiting illegal conduct); DR 1–102(A)(4) (prohibiting dishonesty, fraud, deceit or misrepresentation).

In sum, we conclude that Matthews' involvement in the investment fraud together with the related failure to file federal income tax statements demonstrate his unfitness to practice law. Matthews' actions have reflected a lack of the required character traits of honesty and truthfulness, trustworthiness and reliability, and of an ability to fully conform to the Disciplinary Rules governing the professional and ethical conduct of attorneys.

## V

A fundamental rule in bar admission cases is that evidence of reform and rehabilitation is relevant to the assessment of an applicant's moral character. Rehabilitation is pertinent because the Court is interested in an applicant's present fitness to practice law. Where evidence convincingly demonstrates reform and rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct and, if persuasive, present fitness may be found.

An applicant's attitude and behavior subsequent to disqualifying misconduct must demonstrate a reformation of character so convincingly that it is proper to allow admission to a profession whose members must stand free from all suspicion. *Application of A.T.,* 286 *Md.* 507, 408 *A.2d* 1023, 1027 (App.1979); *March v. Committee of Bar Examiners,* 67 *Cal.2d* 718, 63 *Cal. Rptr.* 399, 408, 433 *P.2d* 191, 200 (1967). The more serious the misconduct, the greater the showing of rehabilitation that will be required. *Application of David H.,* 283 *Md.* 632, 392 *A.2d* 83, 88 (App.1978). In certain instances, evidence of a positive kind including affirmative acts demonstrating personal reform and improvement will be required in order to establish the requisite degree of rehabilitation. *In re Application of Cason,* 249 *Ga.* 806, 294 *S.E.2d* 520, 521, 522–23 (1982). However, it must be recognized that in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to

make. In all cases, the need to ensure the legitimacy of the judicial process remains paramount.

A variety of types of evidence have been found to be probative of reform and rehabilitation. In all instances, the applicant must display complete candor in all filings and proceedings required by the Committee on Character. Courts will weigh heavily the applicant's attitude as expressed in hearings before the Board of Bar Examiners and any reviewing courts, *Application of Easton,* 289 *Or.* 99, 610 *P.*2d 270 (1980), and will look for a renunciation of the past misconduct. *March v. Committee of Bar Examiners, supra,* 63 *Cal.Rptr.* at 408, 433 *P.*2d at 200. The absence of any misconduct over a period of intervening years will, of course, be noted, *see In re Dileo,* 307 *So.*2d 362, 364–65 (La.Sup.1975), and a particularly productive use of one's time subsequent to the misconduct will be credited. *Application of A.T., supra,* 408 *A.*2d at 1027; *In re Petition of Diez-Arguelles,* 401 *So.*2d 1347 (Fla.Sup.1981). Affirmative recommendations from people aware of the applicant's misconduct who specifically consider the individual's fitness in light of that behavior may also be found probative of present good character. *March v. Committee of Bar Examiners, supra,* 63 *Cal.Rptr.* at 408, 433 *P.* 2d at 200.

We are not confident that Matthews has demonstrated his rehabilitation to the extent necessary to justify his admission to practice in view of the gravity of the misconduct that brought us to the conclusion of his unfitness to practice law. We recognize that eight years have passed since the collapse of the fraudulent investment scheme and that Matthews' actions in the interim have not produced any further complaints. We note that Matthews has undertaken to settle his accounts with those who were defrauded and the Internal Revenue Service and indicated some remorse before the Committee on Character. We also recognize that Matthews has demonstrated a continued interest in the practice of law through his employment in a law office and has received favorable reviews by attorneys in that office. Nevertheless, this evidence must be considered in terms

of Matthews' heavy burden of demonstrating his personal reformation.

As noted, Matthews' involvement in the fraudulent investment deal and his failure to file tax returns demonstrate a lack of those traits of character essential to a finding of fitness to practice law. These grave weaknesses of character cannot be redressed simply by his making restitution to victims of the scheme, or paying back taxes or avoiding further unethical conduct. To prove that these severe personal flaws have been truly overcome, Matthews must produce evidence of positive acts that demonstrate that he has become fit to practice. Evidence relating to his business and personal dealings with others and to the responsibilities that he has undertaken as an employee and as a member of his community can be relevant to his ultimate fitness to assume a place in the legal profession. He must show through such evidence that when placed in a position of responsibility, he can act honestly and truthfully and with trustworthiness and reliability in his dealing with others. Further, this evidence must show that he has an understanding of and commitment to the proper administration of justice that may transcend his personal interests as well as the interests of particular clients. He must demonstrate an unquestioned capacity to comport himself properly as a lawyer in full conformity to our Disciplinary Rules.

The record does not reveal whether evidence of rehabilitation and positive acts on Matthews' behalf are sufficiently related to the nature of his wrongdoing to overcome the strong presumption of continuing unfitness to practice law garnered from his prior conduct. Perhaps it was not clearly foreseen that, in this case, the standards for showing reform and rehabilitation would be raised to high levels in view of our conclusion as to the degree of his unfitness to practice. Not anticipating the evidential burden appropriately placed upon him, Matthews may not have marshalled sufficient evidence that is at hand or can be gathered to meet that burden. We do not prejudge the extent

that Matthews has achieved personal reformation and improvement or whether he has advanced personally to a level of suitable fitness to practice law. We are satisfied that he should be given the additional opportunity to make the appropriate showing of reform and rehabilitation to the Character Committee.

Accordingly, the certification of fitness to practice issued by the Committee on Character and Fitness is reversed, without prejudice to the applicant's right to present to the Committee additional evidence concerning his rehabilitation in accordance with the standards set forth in this opinion.

*For reversal*—Chief Justice WILENTZ and Justices SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.