IN THE MATTER OF RALPH W. LABENDZ, AN ATTORNEY AT LAW.

Argued January 10, 1984—Decided February 9, 1984.

*Colette A. Coolbaugh,* Counsel, argued the cause for complainant Disciplinary Review Board.

*Henry N. Luther, III,* argued the cause for respondent (*Dillon, Bitar & Luther,* attorneys; *Mary A. Powers,* on the brief).

PER CURIAM.

This disciplinary proceeding arose as a result of a presentment filed by the District XII Ethics Committee (Committee) against respondent, a member of the bar. It concerns his alleged participation in an attempt to perpetrate a fraud upon a federally insured savings and loan association to obtain a mortgage for a client. After a hearing, the Disciplinary Review Board (DRB) concluded that respondent's conduct violated *DR* 1–102(A)(3) (engaging in illegal conduct that adversely reflects on his fitness to practice law), *DR* 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), *DR* 7–102(A)(3) (knowingly failing to disclose that which he is required by law to reveal), *DR* 7–102(A)(5) (knowingly making a false statement of fact), and *DR* 7–102(A)(7) (counseling or assisting client in illegal or fraudulent conduct). The DRB recommended that respondent be suspended from the practice of law for one year. We agree.

I

Respondent was admitted to the practice of law in 1971. His area of specialization is residential real estate. He had an unblemished record until the events giving rise to these proceedings. His present difficulties arise from his submitting a false loan application to secure a mortgage from United States Savings and Loan Association for Victor and Mathilda DeLorenzo, prospective purchasers of a one-family home in Denville, New Jersey. The DeLorenzos located the property and contracted for its purchase through the services of Brenda Klipper, a real estate salesperson associated with the Weichert Agency.

The contract of sale provided for a purchase price of $100,000. Included in the contract was a clause that made the contract contingent on the securing of a mortgage of $80,000.

The DeLorenzos retained an attorney other than respondent to represent them in the purchase and at the closing. Klipper, however, referred the DeLorenzos to respondent for assistance in obtaining the mortgage. Respondent received a fee of $100 for this service. Victor DeLorenzo, Klipper and respondent met on May 14, 1982 to discuss financing the mortgage. This was the sole meeting respondent had with either of the DeLorenzos.

In its Decision and Recommendation, the DRB summarized the respondent's misconduct as follows:

Respondent testified that, at the meeting, DeLorenzo said he needed an $80,000 mortgage to meet the $100,000 purchase price. Respondent stated that he explained to DeLorenzo that the United States Savings and Loan Association would not allow a mortgage for more than 75% of the purchase price, and, in order to obtain an $80,000 mortgage, the purchase price would have to be "renegotiated" to $107,000. Respondent said Klipper agreed to attempt this. The contract was never renegotiated with the sellers.

Respondent filled out the loan application for the DeLorenzos, and by cover letter dated May 18, 1981 submitted the application to the United States Savings and Loan Association. That application stated the purchase price as $107,000. The purchase price on the sales contract received by the association had been altered from $100,000 to $107,000. The Committee was unable to determine who altered the contract, although respondent denied responsibility. On June 17, 1981 the association, relying upon the revised $107,000 figure on the sales contract issued a mortgage commitment to the DeLorenzos for $80,000.

The alteration of the sales contract did not come to light until mid-July, 1981 when the attorney retained by the DeLorenzos to represent them at the closing instructed his secretary to call Klipper for some information. That attorney testified that his secretary was told by Klipper that there would have to be two separate closings, one for $107,000, and a second for $100,000, and that the savings and loan association was not to know about the second closing with the lower purchase price. In a subsequent conference call with his client, and Klipper, the closing attorney asked Klipper for an explanation of the "two closings". Klipper referred him to the respondent. On the following day, respondent advised DeLorenzo's closing attorney that the purchase price had been "beefed up" to meet the bank's 25% down-payment requirement. Respondent further advised that he should not be concerned about the higher purchase price since the savings and loan association would never pick up the discrepancy. Respondent recommended against following the "two closing" plan mentioned by Klipper because the closing attorney's firm would be "sticking (its) necks out."

Instead he again suggested that the contract be "renegotiated" to $107,000 with reference on the closing statement to a credit for $7,000 to the DeLorenzos, as purchasers.

The closing attorney declined both options presented. Instead, his firm notified the United States Savings and Loan Association of the discrepancy. As a result the existing Loan Commitment of $80,000 was rescinded and an amended commitment of $75,000 was issued. Subsequently, the closing attorney's firm lodged an ethics complaint against respondent.[1]

In his testimony before the Committee's hearing panel respondent claimed that his remarks in the July 19 telephone call to the attorney for the closing were misinterpreted. He admitted recommending that the contract be "renegotiated" and stating that this was proper if there was an "appropriate" credit reflecting a "legitimate" expense. This allegation prompted the following exchange between the chairperson and the respondent:

THE CHAIRPERSON: What legitimate expense can there be to account for that additional $7,000?

THE WITNESS: Could be for closing costs, moving expenses, items that were taken from the house.

\* \* \* \* \* \* \* \*

THE CHAIRPERSON: Was it your understanding in this particular case that the difference between the 100,000 that had already been agreed upon and the $107,000 that was a proposed amendment was to be accounted for by the sale of any additional items of value?

THE WITNESS: Actually, I left it to the realtor on this. So, I can't recall what I had in mind.

THE CHAIRPERSON: And when you suggested in your conversation and your lie with the closing attorney that there was another way of dealing with the problem, and that was at that late date to go back to the seller and attempt to renegotiate the contract, did you have in mind that the buyers were going to purchase some new or additional rights or property for the additional $7,000?

THE WITNESS: No.

[1]There was also another misrepresentation on the mortgage application. It was represented in the mortgage application that no part of the down payment had been borrowed. This was untrue, for the DeLorenzos had a $20,000 "bridge loan" from another banking institution to pay the down payment. The Association upon learning of the bridge loan from the closing attorney acknowledged its willingness to proceed. It is, however, unclear from the record whether respondent had personal knowledge of the bridge loan.

## II

Upon our independent examination of the record, we agree with the DRB's conclusion that respondent's violations of *DR* 1–102(A)(3), *DR* 1–102(A)(4), *DR* 7–102(A)(3), *DR* 7–102(A)(5), and *DR* 7–102(A)(7) have been clearly and convincingly established.

Respondent knowingly assisted DeLorenzo and Klipper in an attempt to perpetrate a fraud upon the United States Savings and Loan Association. It is undisputed that there never was a contract for $107,000. When respondent met with Klipper and Victor DeLorenzo to fill out the application, he unquestionably knew that there was no $107,000 contract in existence and that the true contract price was $100,000. He also knew that the suggested renegotiation was a sham, for he admitted that he did not intend the buyers to purchase any new rights or property for the alleged $7,000 credit.

Respondent therefore violated *DR* 1–102(A)(3) and *DR* 1–102(A)(4) by engaging in illegal and fraudulent conduct in completing and submitting to the United States Savings and Loan Association the mortgage application, he knew to be false; *DR* 7–102(A)(5) by knowingly making a false statement of fact; *DR* 1–102(A)(7) by counselling and assisting his client to engage in conduct he knew to be illegal and fraudulent; and *DR* 7–102(A)(3) by failing to disclose in his representation of his client that which he was required by law to reveal.

The serious nature of respondent's conduct, involving misrepresentations and violations of law, led the DRB to recommend the imposition of a one year suspension from the practice of law.

## III

Respondent acknowledges that his conduct was unethical and violates the Disciplinary Rules. Nevertheless, he submits that this single violation, resulting in no harm to any party involved, appearing in an otherwise exemplary record does not merit the penalty of suspension for one year.

In support of his position, respondent points to his unblemished record prior to this transaction; to the many letters from attorneys and other members of the community attesting to his outstanding record and reputation, including one from the United States Savings and Loan Association; to the lack of harm done to any party; and to the fact that he did not profit personally, as the $100 fee did not cover the time and effort he expended in this case.

He also alleges that a one year suspension is excessive in light of the public reprimands imposed in *In re Sugarman*, 95 *N.J.* 7 (1983) (improper procedures in a *pro se* civil action); *In re Coughlin*, 91 *N.J.* 374 (1982) (improper execution of jurat); *In re Spagnoli*, 89 *N.J.* 128 (1982) (improper signing of client's name to affidavit); and *In re Conti*, 75 *N.J.* 114 (1977) (improper signing of client's name to deeds). In the improper jurat cases relied upon by respondent, the execution of the documents rather than their content *per se* was at issue; there, the statements in the documents were accurate and not misrepresentations. Further, in *In re Sugarman, supra,* each separate individual action of the attorney did not constitute an ethical violation. Rather, it was the total pattern that created an ethical violation.

We are not unmindful of the mitigating factors and recognize that respondent has not been charged with any crime. Nevertheless, we find that a one year suspension is justified based on *In re Silverman*, 80 *N.J.* 489 (1979) (18 month suspension), and *In re Mocco*, 75 *N.J.* 313 (1978) (one year suspension). Both these cases are factually closer to this case than those relied upon by respondent. Both *In re Silverman, supra,* and *In re Mocco, supra,* involved actual misrepresentations.

In *In re Silverman, supra,* the respondent filed a false answer with the bankruptcy court for the purpose of aiding his client to retain custody of certain assets of the firm in bankruptcy. Respondent pled guilty to one count of obstruction of justice. The Court, in assessing discipline, noted his prior unblemished record of 50 years as a lawyer, the fact that no party suffered

any loss, his cooperation with the ethics proceedings, his frank admission of guilt, his obvious contrition, and the court's belief that the incident was an aberration not likely to be repeated. Nevertheless, the court concluded that the single misrepresentation compelled the imposition of an 18 months suspension from the practice of law.

In *In re Mocco, supra,* all of the questionable transactions arose out of respondent's friendship with the owner of a gasoline station. In connection with that business, he made misrepresentations to Mobil Oil and to state and federal agencies. The court found as mitigating circumstances the respondent's inexperience, the absence of a malicious intent, and the fact that no harm was visited upon anyone. As here, respondent was not charged with any crime. Nevertheless, the court imposed a one-year suspension from the practice of law.

Our independent review of the record leaves no doubt that respondent knowingly made and, in fact, instigated the fraudulent misrepresentations. We conclude such conduct constitutes a more serious transgression of the disciplinary rules than those of the attorneys in *In re Coughlin, supra; In re Spagnoli, supra; In re Conti, supra;* and in *In re Sugarman, supra,* and is much more similar to the attorneys' conduct in *In re Silverman, supra,* and *In re Mocco, supra.*

We are not unmindful that aside from this incident, respondent's record is unblemished and his reputation excellent. No party has suffered any loss and he did not realize any substantial personal gain from the transaction. Nevertheless, a lawyer has the independent duty to act with total honesty and to avoid participating in any fraud or misrepresentation.

Accordingly, in keeping with the DRB's recommendation we conclude that respondent's ethical infractions call for suspension from the practice of law for a period of one year. We also impose upon respondent the obligation to reimburse the Administrative Office of the Court for appropriate administrative costs, including those for the production of transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIF-FORD, SCHREIBER, HANDLER, O'HERN and GARIBALDI —6.

*Opposed*—None.

## ORDER

It is ORDERED that RALPH W. LABENDZ of PARSIPPA-NY be suspended from the practice of law for one year, effective February 27, 1984, and until the further order of this Court; and it is further

ORDERED that RALPH W. LABENDZ reimburse the Administrative Office of the Courts for appropriate administrative costs, including the production of transcripts; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.