587 A.2d 1245
IN THE MATTER OF DOMINICK GIORDANO, AN
ATTORNEY AT LAW.

Argued November 27, 1990—Decided March 15, 1991.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Adolph J. Galluccio* argued the cause for respondent (*Browne and Galluccio*, attorneys).

PER CURIAM.

This disciplinary proceeding arose from a motion filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB), seeking final discipline of respondent, Dominick Giordano, pursuant to *Rule* 1:20–6. The motion was based on respondent's plea of guilty to the offense of tampering with public records, in violation of *N.J.S.A.* 2C:28–7, *N.J.S.A.* 2C:2–6, and *N.J.S.A.* 2C:5–1. The DRB found that respondent has engaged in illegal conduct that adversely reflects on his fitness to practice law, and recommended that he be suspended from the practice of law for three years.

I

The case concerns a bizarre love-for-favors arrangement between respondent and an intermediary in a web of criminal tampering with the licensing records of the New Jersey Division of Motor Vehicles (DMV). Because the participants included a former prostitute and one who has since committed suicide, we use fictitious names in our recital.

In late 1985, a State Police informant, Baker, outlined for the State Police the details of a scheme to sell official State driver licenses generated by programming the DMV's computers to overlook existing suspensions and reissue licenses illegally. The cost of the licenses varied from $1,000 to $2,000. Baker was a feeder in the operation. He was paid for contacting a go-between, Eisner, who in turn contacted Don Peko, the live-in lover of Mary Oxnard, a DMV employee at its office in Eatontown. Because Oxnard had access to the DMV's computer, she was the key to the scheme. She received $50 to $100 for having the machine issue the licenses. The feeders were paid about $200 and the rest went to the intermediaries, Eisner and Peko.

When confronted by the State Police in early February of 1986, Oxnard and Peko agreed to cooperate. Eisner committed suicide.

One of Baker's customers was Myra Day, a prostitute, who had dealt with Baker on behalf of potential license buyers who were sometimes referred to her by her own customers. She called Baker on February 21st to tell him that her attorney, the respondent, Dominick Giordano, had inquired if she could still get licenses. Giordano had called to tell her that one of his clients, Clyde Passeau, whose license had been suspended for driving while intoxicated, would be calling her.

Baker relayed that information to the State Police, who surveilled Day's February 24th meeting with Passeau. They subsequently arrested her, and she too agreed to cooperate. The police gave her a fictitious license for a meeting scheduled for February 29th with Passeau. Passeau accepted the license and was arrested as he walked away from their meeting. He agreed to cooperate, and the police set up a call from Passeau to Giordano. During that conversation, Passeau thanked Giordano for getting him his license. Giordano commented in response: "Ah—I'm glad everything worked out for you."

In the meantime, Day informed the State Police that she had received a message from Giordano on March 3rd concerning the deal with Passeau. On March 4, 1986, pursuant to police authorization, Day recorded a telephone call to Giordano in which Giordano said: "[Passeau] was very pleased and * * * you know, in that field word, word travels, and there may be a lot more." Giordano went on to say that he told Passeau that if he knew someone who needed a license, Passeau should call him to resolve it.

On March 5, 1986, the police equipped Passeau with a recorder to record a conversation with Giordano at his law office. During that meeting, Giordano made a copy of the license so that he could later check its authenticity. Passeau told Giordano that he knew other people who were interested in obtaining

licenses. Giordano responded by saying, "Who are they? these good people?—I mean—ah—?" However, he told Passeau to wait and not to have anyone contact him at that time.

The matter was presented to a State grand jury, which returned an indictment against respondent charging him with attempted bribery, attempted tampering with public records, and conspiracy in connection with helping a client who had lost his driving privileges obtain a false driver license. Pursuant to a plea agreement, respondent pled guilty to the third-degree offense of attempted tampering with public records in violation of *N.J.S.A.* 2C:28–7, *N.J.S.A.* 2C:2–6, and *N.J.S.A.* 2C:5–1. It is of no moment that in the twist of double agency the State Police had not delivered to Passeau the official license for which he had bargained. Respondent had aided Passeau in the effort to get one illegally. The court sentenced him to perform two hundred hours of community service.

## II

Our independent review of the record leads us to the conclusion that respondent has engaged in unethical conduct.

First, we accept a criminal conviction as conclusive evidence of guilt in disciplinary proceedings. *In re Rosen*, 88 *N.J.* 1, 3, 438 *A.*2d 316 (1981). The underlying facts of the conviction are relevant to the determination of the appropriate discipline to be imposed. *Ibid.*

The principles that we apply in measuring the discipline are as follows:

> Our goal in these hearings is to protect the interests of the public and the bar while giving due consideration to the interests of the individual involved. *In re Mischlich*, 60 *N.J.* [590,] 593 [292 *A.*2d 23 (1972)]. Similar to a sentencing judge in a criminal matter, we take into consideration many factors in determining the proper discipline to be imposed. *Cf. N.J.S.A.* 2C:44–1. We consider the nature and severity of the crime, and whether the crime is related to the practice of law. We consider "evidence which does not dispute the crime but which shows mitigating circumstances [relevant to] the issue of whether the nature of the 'conviction merits discipline and, if so, the extent thereof.'" *In re*

*Mischlich,* 60 *N.J.* at 593 [292 *A.*2d 23] (citations omitted); *see In re Rosen,* 88 *N.J.* at 3 [438 *A.*2d 316]; *In re Mirabelli,* 79 *N.J.* [597,] 601 [401 *A.*2d 1090 (1979)]; *In re La Duca,* 62 *N.J.* [133,] 136 [299 *A.*2d 405 (1973)]. Similarly, we consider evidence of an attorney's good reputation, his prior trustworthy professional conduct, and his general good character. *In re Mischlich,* 60 *N.J.* at 593 [292 *A.*2d 23].

[*In re Infinito,* 94 *N.J.* 50, 57, 462 *A.*2d 160 (1983).]

In applying those principles to the underlying facts, we find that the offense arose directly from a lawyer-client relationship and was therefore related to the practice of law. The crime is defined as a "serious crime" in our Rules. *Rule* 1:20–6(b)(2) defines "serious crime" as "any crime of the first or second degree as defined by the New Jersey Code of Criminal Justice * * * or any felony of the United States * * * or of any state * * *." In addition, we define as "serious crimes" any crime involving "interference with the administration of justice, false swearing, misrepresentation, fraud, deceit, bribery, extortion, misappropriation, [or] theft * * *." *Ibid.*

Although that definition is contained in a provision dealing with automatic temporary suspension of attorneys convicted of crimes, it reflects our belief that crimes of dishonesty touch on a central trait of character. In the context of application for admission to the bar, we have concluded that a bar applicant "must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice." *Application of Matthews,* 94 *N.J.* 59, 77, 462 *A.*2d 165 (1983). We described those traits as the "fundamental norms that control the professional and personal behavior of those who as attorneys undertake to be officers of the court." *Id.* at 78, 462 *A.*2d 165. We have long and firmly held that " '[i]n the legal profession, there must be a reverence for the truth.' " *Application of Jenkins,* 94 *N.J.* 458, 470, 467 *A.*2d 1084 (1983) (quoting *In re Hyra,* 15 *N.J.* 252, 254, 104 *A.*2d 609 (1954)). Thus, we suspended, for a period of three years, an attorney who had pled guilty to making a misrepresentation on a certification filed in a cause. *In re Kushner,* 101 *N.J.* 397, 502 *A.*2d

32 (1986); *see also In re Labendz*, 95 *N.J.* 273, 274–75, 471 *A.*2d 21 (1984) (attempt to obtain mortgage for client from federally-insured lender through fraudulent alteration of real-estate contract warrants one-year suspension). And when a crime of dishonesty touches on the administration of justice, the offense is deserving of severe sanctions and would ordinarily require disbarment. *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984) (citing *In re Hughes*, 90 *N.J.* 32, 446 *A.*2d 1208 (1982)).

Were there any evidence that respondent in any way solicited or received personal financial gain from this sordid episode, or played a continuing role in the criminal conspiracy, the offense would surely merit disbarment. In *In re Goldberg*, 105 *N.J.* 278, 283, 520 *A.*2d 1147 (1987), we emphasized that when a criminal conspiracy evidences "continuing and prolonged, rather than episodic, involvement in crime," is "motivated by personal greed," and involves the use of the lawyer's skills "to assist in the engineering of the criminal scheme," the offense merits disbarment. *See also In re Lunetta*, 118 *N.J.* 443, 449, 572 *A.*2d 586 (1989) (disbarring attorney involved in "protracted criminal conspiracy" to receive and sell stolen securities); *In re Alosio*, 99 *N.J.* 84, 87, 491 *A.*2d 628 (1985) (disbarring mastermind of scheme involving stolen high-priced cars who pleaded guilty to one count of presenting false and fraudulent insurance claim and six counts of receiving stolen property worth hundreds of thousands of dollars). Such conspiracies pose a "direct threat to society," and "[d]isbarment, the strongest sanction available, must be imposed in order to preserve the integrity of the bar." *In re Goldberg, supra*, 105 *N.J.* at 283, 520 *A.*2d 1147. All that saves respondent here is the lack of any evidence that he was indeed a continuing part of a criminal conspiracy or that he was motivated by greed. Had it been otherwise, the conduct would clearly pose a direct threat to society, undermining not only the DMV's regulatory program, but endangering public safety. For, despite some suggestion to the contrary, the hard evidence in this case is limited to the one episode involving Day and Passeau.

The evidence before the grand jury was clear: respondent asked for and expected no part of the money. Respondent's seemingly-uncontested presentation to the DRB was:

> They asked Mr. [Passeau], the person who was buying that—before the grand jury. Did he ever ask you or—or receive any money? Did he expect—No.
>
> The answers are absolutely clear, and the Attorney General even—conceded that there was no pecuniary gain. Where the gain was going to come in, unfortunately, is because Mr.—for some—perhaps some marital problems at home, which are really not that material at this point, is that this girl—this [Myra Day,] [he] is in some way romantically involved with her. And, as she said before the grand jury, he didn't want money he just wanted me to, I think as she put it, to get back on track with him again, to—for some type of sex * * *.

In setting the appropriate discipline in this case, then, we consider these factors. First, although this crime did relate to the practice of respondent's profession, it appears to have been entirely tangential to it and to have been motivated by his desire to gain favor with this young woman. Second, the act was episodic and entirely out of character for him. As the sentencing judge observed:

> Mr. Giordano was an attorney who was professionally competent and who otherwise over thirty years practiced his profession in a manner that engendered respect from his colleagues, from his clients, as attested to by the numerous letters of support I received for Mr. Giordano. * * *
>
> In short, I do feel that this particular act was an isolated act which was an aberration in an—otherwise unblemished career.

What we must decide, then, is whether respondent's conduct reveals a flaw running so deep that he can never again be permitted to practice law. This is not a case like *In re Conway*, 107 *N.J.* 168, 526 *A.*2d 658 (1987). In that case, the attorney's participation was not limited to one transgression. He took part in several meetings organized to bring about the crime. The attorney's conduct was seen as "involving the commission of crimes that directly poison the well of justice." *In re Conway, supra*, 107 *N.J.* at 182, 526 *A.*2d 658 (quoting *In re Verdiramo, supra*, 96 *N.J.* at 186, 475 *A.*2d 45).

Nor is this a case like *In re Edson*, 108 *N.J.* 464, 530 *A.*2d 1246 (1987), in which an attorney cynically counseled his clients

to lie and was paid for that advice. "[R]arely have we encountered in our colleagues at the bar the kind of shocking disregard of professional standards, the kind of amoral arrogance, that is illustrated by [Edson's] record." *Id.* at 472–73, 530 *A*.2d 1246; *see also In re Tuso,* 104 *N.J.* 59, 64, 514 *A*.2d 1311 (1986), in which the attorney "engaged in a pernicious, sustained, and adroit attempt to corrupt a public official, a school board member, to serve his own financial ends."

This respondent's conduct seems more akin to that in *In re Farr,* 115 *N.J.* 231, 557 *A*.2d 1373 (1989), in which a prosecutor had similarly fallen victim to a desire to encourage a relationship with a young woman. The prosecutor gave her narcotics that had been in the State's possession, and manipulated the justice system to further their relationship. He was suspended for a term of years for his misconduct. We said that his conduct "was aberrational and not likely to occur again." *Id.* at 236, 557 *A*.2d 1373.

We have recognized that even in proceedings involving crimes of dishonesty, mitigating factors may justify imposition of sanctions less severe than disbarment. *See In re Labendz, supra,* 95 *N.J.* 273, 471 *A*.2d 21 (suspending for one year an attorney who had instigated fraudulent misrepresentations to a federally-insured lender for the purpose of obtaining a mortgage, noting his previous excellent reputation and unblemished record and lack of personal gain); *In re Kushner, supra,* 101 *N.J.* 397, 502 *A*.2d 32 (suspending for three years an attorney who knowingly made a false certification in court to avoid liability on a promissory note that he had signed, noting aberrational nature of misconduct).

In light of those precedents, we are satisfied to adopt the measure of discipline recommended by the DRB, and we order that respondent be suspended from the practice of law for a period of three years. Let there be no mistake, though; lawyers do not get two chances to commit an offense like this. When an attorney participates in criminal conduct designed to

subvert fundamental objectives of government, objectives designed to protect the health, safety, and welfare concerns of society, the offense will ordinarily require disbarment. *See In re Verdiramo, supra*, 96 *N.J.* at 186, 475 *A.*2d 45. That profit is not involved or that there is no prior misconduct will rarely be sufficient mitigation. Only the misguided motivation of this respondent saves him from disbarment.

We further direct respondent to reimburse the Ethics Financial Committee for costs, including but not limited to the cost of producing transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN join in this opinion—7.

*Opposed*—None.

### ORDER

It is ORDERED that DOMINICK GIORDANO of PASSAIC, who was admitted to the bar of this State in 1959, is hereby suspended from the practice of law for three years and until the further Order of the Court, effective October 31, 1989; and it is further

ORDERED that respondent shall be enjoined and restrained from practicing law during the period of his suspension and that he shall comply with Administrative Guideline No. 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate Administrative Costs incurred in the prosecution of this matter.