IN THE MATTER OF L. GILBERT FARR, AN ATTORNEY-AT-LAW.

Argued April 25, 1989—Decided May 26, 1989.

232

*Thomas J. McCormick*, First Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Justin P. Walder* argued the cause for respondent (*Walder, Sondak, Berkeley & Brogan*, attorneys).

PER CURIAM.

Nine years ago respondent became involved in a bizarre incident in which he committed serious ethical infractions. The District XIII Ethics Committee (Committee) recommended a private reprimand, and the Disciplinary Review Board (DRB) recommended a suspended two-year suspension. In February 1982 respondent voluntarily suspended himself from the practice of law, except for *pro bono* work. Under the unique circumstances of this case, we are persuaded that an additional six-months' suspension is both necessary and adequate.

Respondent was admitted to the bar in 1977, and in 1978 he became an assistant prosecutor in Somerset County. Described by his superiors in the prosecutor's office as "one of the most-committed" and "hardest-working" prosecutors, he was also characterized as naive, immature, and susceptible to manipulation by others. Against that background, he became involved with Pamela Rutledge and Thomas DeFeo, who served as informants in an investigation of a residential-treatment center for disturbed youths. Both informants were described as "street-wise," and Mr. DeFeo was a convicted criminal. In the course of his involvement with the couple, respondent became infatuated with Ms. Rutledge. To ingratiate himself with her, he committed a series of gross improprieties. We need not belabor the details of the sordid incident. Suffice it to

say that while respondent thought he was manipulating the informants, they were also manipulating him.

On one occasion, respondent removed some marijuana and phencyclidine (PCP) from the prosecutor's office. The informants smoked this marijuana at respondent's home. Although the record is not clear whether respondent joined them on this occasion, he had smoked marijuana with them previously.

On another occasion when the police discovered marijuana and other controlled dangerous substances in the informants' apartment, the police arrested them. Ms. Rutledge called respondent, and he stopped the search of the apartment. His explanation is that he thought, under the circumstances, a search warrant was required. He then obtained approval to draw the warrant. Thereafter he embarked on a course of conduct in which he simultaneously sought to accommodate Rutledge and fulfill his obligations as a prosecutor. Although he assured Rutledge that he would try to reduce the bail for her cohort, DeFeo, respondent urged the court to increase the bail. His motivation was to have more time alone with Rutledge. Although he purported to help Rutledge and DeFeo with the motion to suppress the contraband seized in their apartment, he wrote a supplemental trial brief to sustain the search. When the trial court suppressed the contraband, respondent wrote an appellate brief that led to the reversal of the suppression order.

While DeFeo was in jail, respondent took Rutledge out to dinner. Respondent received a telephone call from a municipal police department concerning a search warrant, and he invited Rutledge to accompany him to police headquarters, where he introduced her as a legal intern in the prosecutor's office. He repeated the introduction to the police at the premises being searched.

The DRB summarized the details of respondent's conduct:

As this sorry state of affairs reveals, respondent betrayed the confidence reposed upon him, as a prosecutor, by the members of the public, whose

interests he swore to protect. By developing a personal relationship with Rutledge and DeFeo, a relationship which exceeded the bounds reasonably necessary to obtain cooperation from an informant, respondent's responsibilities to the public were greatly compromised.

He knew the Prosecutor's Office prohibited attorneys to be directly involved with informants, without the aid of detectives, who are specially trained to conduct investigations. Yet, he deliberately violated that policy, refusing to comply therewith even after an admonition by the then Prosecutor.

He deliberately placed his personal interests above the duties required of him as an attorney and as a public official. He repeatedly forsook his client, the public, for his own interests and those of Rutledge and DeFeo, criminal defendants from whom he had the duty to protect the public. He breached the public trust when he traded loyalties and turned counsel for Rutledge and DeFeo by assisting them in the preparation of their motion to suppress; when he vigorously pursued the reduction of DeFeo's bail and played "musical courts", thereby deceiving the judicial system; when he personally made it possible for DeFeo to be released by providing his bail money; and when he stole evidence—illegal substances—from the State, for his own use and that of his friends.

Even when his conduct might have been perceived as zealous by a less watchful observer, respondent abdicated his responsibility to honor and uphold the system. When he suggested to the screening officer that DeFeo's bail be set at a high amount; when he twice opposed the bail reduction application by the Public Defender; when he diligently and properly obtained a search warrant; when he redrafted the brief prepared by the legal assistant to oppose the motion to suppress; and when he vigorously pursued an appeal from the trial court's decision to grant the motion to suppress, respondent did not have the State's interest at heart, but his own. As conceded, he was impelled by one improper motive: to ensure that DeFeo be kept away from Rutledge so that he, respondent, could substitute for DeFeo in Rutledge's affections. His *ultra vires* use of the judicial system for his own personal motives tarnished its image held by the members of the public.

Respondent committed other serious offenses as well. He promised to bury in his desk drawer a murder warrant on DeFeo (that he believed or knew the warrant did not exist is irrelevant to the promise); he threatened DeFeo with severe consequences in his criminal case, in the event that DeFeo did not accede to his demands to see Rutledge more frequently; he stole evidence from the evidence room; he used and distributed the stolen evidence, which consisted of controlled dangerous substances; he destroyed the remainder of the evidence; he lied on Rutledge's credit card applications when he misrepresented that she was employed by one of his father's companies; he counselled DeFeo to "go underground" after his release on bail; and he lied to the Attorney General's Office when he denied his use and possession of controlled dangerous substances. [Transcript references omitted.]

His conduct becomes somewhat more understandable, if not excusable, on considering the concurrence of several unrelated events in his personal life. As the DRB explained:

> At the time of the transgressions, respondent was a young and inexperienced attorney, having been a member of the bar for only three years. Pursuant to the testimony of the then Prosecutor and of respondent's immediate supervisor at that time, the Deputy First Assistant Prosecutor in charge of investigations, respondent was very naive, often immature in his responses to life situations and, therefore, capable of being manipulated by individuals with stronger personalities.
>
> The severe personal problems which confronted respondent at the time of his derelictions greatly affected his sense of proportion and his judgment, as agreed by Robert L. Sadoff, M.D., Raymond H. Schweibert, M.D., and Stanley R. Kern, M.D. His marriage was falling apart. His mother began to drink heavily and complained of physical abuse by his father. In April 1980, his parents bid him good-bye for what was supposed to be a vacation and never returned. His father, a businessman and prominent figure in the community, left debts and civil judgments in great sums of money, as a result of which respondent was forced to face numerous creditors and adverse publicity, including several newspaper articles about his father's mysterious disappearance. Respondent's improper conduct was also the subject of great notoriety. One local newspaper article incorrectly stated that respondent had pled guilty to the accusation filed by the Attorney General's Office. [Transcript references and footnotes omitted.]

■ We are inclined to agree with the Committee, which concluded that respondent's conduct "was aberrational and not likely to occur again." In reaching that result, the Committee relied on a report of the psychiatrist who treated respondent from February 1982 to January 1984. The psychiatrist concluded that respondent's conduct was attributable to "an unusual combination of circumstances that caused him to lose his sense of proportion and to act in an unreasonable fashion." He further concluded that respondent had "made a good adjustment to his problems * * * and that future similar problems are extremely unlikely."

Since the discovery of his misconduct, respondent has resigned as an assistant county prosecutor, successfully completed a Pretrial Intervention Program, been discharged from psychiatric treatment, performed 508 hours of *pro bono* service with the Warren County Legal Services, and served for three

years as a volunteer for the Public Defender's Office in East Orange. As did the Committee and the DRB, we believe that respondent has been rehabilitated.

Approximately nine years ago, respondent—then a young, even immature, but hardworking assistant county prosecutor—went through a period of extreme personal stress. During that period, he lost his ethical compass and went astray. In the interim, he has found his bearings. When, as here, ethics transgressions are remote in time, we may consider intervening events and current circumstances in determining the appropriate sanction. *In re Kotok*, 108 *N.J.* 314, 330 (1987). As offensive as was respondent's conduct, we are persuaded that "the root of his transgressions is not intractable dishonesty, venality, immorality, or incompetence. We generally acknowledge the possibility that the determinative cause of wrongdoing might be some mental, emotional, or psychological state or medical condition that is not obvious and, if present, could be corrected through treatment." *In re Templeton*, 99 *N.J.* 365, 374 (1985). By receiving needed psychotherapy and performing various good works, respondent has rehabilitated himself. We share the views of the Committee and the DRB that respondent need not be disbarred to preserve confidence in the bar or to protect the public. We cannot, however, ignore the seriousness of his infractions.

The Committee found that respondent had violated *Disciplinary Rule* 1–102(A)(3), by his removal of marijuana and PCP from the evidence room of the prosecutor's office, by his use and possession thereof, and by providing it to others to use; *Disciplinary Rules* 1–102(A)(5) and (6), 5–101(A), and 7–101(A)(3), by actively participating in the bail proceedings involving DeFeo; *Disciplinary Rules* 1–102(A)(5) and (6), 5–101(A), and 7–101(A)(3), by continuing his social relationship with DeFeo and Rutledge after their arrest, by providing them with information helpful to the defense of the criminal case against them, and by actively participating in the handling of

the prosecution of the case; and *Disciplinary Rule* 1–102(A)(4), (5), and (6), by falsely introducing Rutledge to members of the Bridgewater Police Department as an employee of the prosecutor's office, and by allowing her to accompany him during a narcotics investigation. As did the DRB, we too find that the evidence clearly and convincingly supports a finding of unethical conduct. Given the seriousness of his offenses, we believe some additional period of suspension is appropriate. On balance, we conclude that in addition to his voluntary self-imposed suspension, respondent should be suspended for an additional six months.

█ One final word is in order. As previously indicated, the DRB found as a mitigating circumstance that respondent "voluntarily suspended himself from [the] practice [of law] from February 1982 until January 1984, when he began to perform *pro bono* work for Warren County Legal Services." We need not disagree with that finding to recite that if in the future a respondent seeks to urge suspension from practice as a relevant mitigating factor, the suspension must be imposed by order of the Court and not through the voluntary action of the respondent. Otherwise, the Court will be unable to assess and supervise the suspension.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HEARN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

L. GILBERT FARR of SOMERVILLE, who was admitted to the bar of this State in 1977, having been ordered to show cause

why he should not be disbarred or otherwise disciplined, and good cause appearing;

It is ORDERED that L. GILBERT FARR be suspended from the practice of law for a period of six months, effective June 19, 1989; and it is further

ORDERED that L. GILBERT FARR be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics governing suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.