607 A.2d 1307

IN THE MATTER OF FRANCIS A. BOCK,
AN ATTORNEY AT LAW.

Argued March 17, 1992—Decided June 26, 1992.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Martin Newmark* argued the cause for respondent (*Broderick, Newmark & Grather,* attorneys).

PER CURIAM.

■ This attorney discipline matter arises from a Report and Recommendation of the Disciplinary Review Board (DRB) that respondent be suspended from the practice of law for a period of three months. Three members of the DRB disagreed and concluded that a public reprimand, coupled with a requirement of certain supervisory practices, would constitute sufficient punishment. The majority recommendation is based on findings of the District X Ethics Committee, concurred in by the DRB, that respondent had engaged in unethical conduct in violation of *RPC* 8.4(c) and (d), conduct involving dishonesty, fraud, deceit, or misrepresentation, and conduct prejudicial to the administration of justice. That finding was based on respondent's feigning his own death by drowning and compounding that act by concealing his whereabouts for five weeks, despite knowledge of an official investigation to locate him.

Respondent does not deny the essential facts but asserts that the acts of misconduct resulted from a psychological disorder and neither were intended to nor did they result in personal gain. Respondent thus contends that the Court should not follow the Board's recommendation that he be suspended from the practice of law.

Based on our independent review of the record, we find clear and convincing evidence that respondent engaged in conduct proscribed by *RPC* 8.4(c) and (d) and that a six-month period of suspension is warranted.

I

As noted, to his credit, respondent did not deny the material factual allegations of the complaint but rather questioned only

whether the facts established an ethical violation. Respondent's version of the facts is as follows: Respondent had been practicing law in New Jersey with an unblemished record for thirty years when the events that gave rise to this complaint occurred. On November 7, 1989, depressed as a result of his wife's incessant and repeated interrogations concerning a recently-disclosed extra-marital affair with Martha Heath, respondent arranged with Ms. Heath to leave New Jersey. After leaving contrived evidence on Long Beach Island designed to give the impression that he had drowned, Ms. Heath drove respondent to New Brunswick where he boarded a train to Baltimore. He took an apartment near Easton, Maryland under an assumed name. Respondent remained there for approximately five weeks before returning to New Jersey on December 14, 1989, after the Morris Plains Police Department and the Morris County Prosecutor's Office located him.

At the time of his "disappearance," respondent was a part-time municipal court judge in the Borough of Morris Plains, and was engaged in the practice of law in Morris Plains with a partner and associate. He was responsible for sixty to seventy files. Respondent asserts that although he told neither his partner, associate, nor clients that he was leaving New Jersey for an indefinite period, he knew that his partner and associate could handle his caseload in his absence. As it turned out, no client left the firm as a result of respondent's conduct. He was removed from office as a municipal court judge by order of the Superior Court.

Respondent argues that this case presents a novel situation in which the Court must decide whether conduct that would otherwise be personal and private may form the basis of an ethical violation. He argues that except for the public expenditure of funds, which the respondent never anticipated, respondent caused no injury except for that suffered by his family. Further, respondent argues that his psychotherapist's testimony established that his conduct not only was aberrational but was the product of a psychiatric disorder. That disorder, stemming from his torn desire at once to join his life with Ms.

Heath, yet to avoid causing the pain to his wife or children attendant to a divorce, prevented him at the time from understanding the options open to him. Those actions, which were doomed to failure from the start, were the result of respondent's confused state and were not rationally thought out.

In a long series of cases, the Court has examined the extent to which evidence of compulsion may tend to exculpate conduct that would otherwise be unethical. Although those cases usually have arisen in the context of knowing misappropriation of clients' funds, the principles are applicable here. We start with the proposition that "there may be circumstances in which an attorney's loss of competency, comprehension, or will may be of such a magnitude that it would excuse or mitigate conduct that was otherwise knowing and purposeful." *In re Goldberg,* 109 *N.J.* 163, 168, 536 *A.*2d 224 (1988) (citing *In re Jacob,* 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984)).

Almost invariably, however, we find that the attorney has not lost comprehension or competency but rather has yielded to the compulsion, and whether the compulsion is due to drugs, gambling, or alcohol, "dependent attorneys retain an area of volition sufficient that we cannot distinguish these attorneys from those who yield to the equally human impulse to avert shame, loss of respect, or family suffering." *In re Lobbe,* 110 *N.J.* 59, 66, 539 *A.*2d 729 (1988). Although we understand that compulsive behavior may lead to misconduct, we will not allow the public to go unprotected, especially those who are clients. Thus, in *In re Yaccarino,* 117 *N.J.* 175, 196, 564 *A.2d* 1184 (1989), we measured the attorney's misconduct by whether he had "known that what he was doing was unethical and improper, and that he could have refrained or desisted from doing what he did." We note that in this case there is no psychiatric evidence that respondent was at any time out of touch with reality or unable to appreciate the ethical quality of his acts. His medical expert conceded that he "did understand what he was doing and [the] potential consequences of what he was doing." He may have been under a severe compulsion to

engage in the conduct but he did not lack the ability to understand the nature of his acts.

We recognize that in some instances lawyers may fall victim to a desire to encourage a relationship with another and thus may engage in conduct that is "aberrational and not likely to occur again." *In re Farr,* 115 *N.J.* 231, 236, 557 *A.*2d 1373 (1989). *Accord In re Giordano,* 123 *N.J.* 362, 368, 587 *A.*2d 1245 (1991) (desire to gain favor with young woman was isolated act that was an aberration in an otherwise unblemished career). That mitigation served only to prevent the imposition of the most severe sanctions. Those attorneys, however, did receive substantial periods of suspension.

The District Ethics Committee found, and we agree, that the respondent had willingly and voluntarily staged his death. Whatever credence one may give to the effect of the stress-induced anxiety of a troubled marriage and the impulsive nature of the act, unravels in light of respondent's calculated disappearance (he left a note for his wife designed to alert her to the place of his disappearance and tied that in with a reference to available funds) and his five-week continuation of the plan.

## II

We turn, then, to the issue of appropriate discipline. The attorney-disciplinary system is designed primarily to preserve public confidence in the legal system. *In re Spitalnick,* 63 *N.J.* 429, 431–32, 308 *A.*2d 1 (1973). The goal of the disciplinary proceedings is not to punish, of course, but to protect the interests of the public and the bar, mindful of the interests of the individual involved. *In re Infinito,* 94 *N.J.* 50, 57, 462 *A.*2d 160 (1983). Even the private conduct of attorneys may be the subject of public discipline. In *In re Mattera,* 34 *N.J.* 259, 168 *A.*2d 38 (1961), this Court stated:

[T]he disciplinary power is not confined to the area covered by the canons. It has long been settled here and elsewhere that any misbehavior, private or

professional, which reveals lack of the character and integrity essential for the attorney's franchise constitute a basis for discipline. The reason for this rule is not a desire to supervise the private lives of attorneys but rather that the character of a man is single and hence misconduct revealing a deficiency is not less compelling because the attorney was not wearing his professional mantle at the time. Private misconduct and professional misconduct differ only in the intensity with which they reflect upon fitness at the bar. This is not to say that a court should view in some prissy way the personal affairs of its officers, but rather that if misbehavior persuades a man of normal sensibilities that the attorney lacks capacity to discharge his professional duties with honor and integrity, the public must be protected from him.

[*Id.* at 264, 168 *A.*2d 38 (citations omitted).]

█ The principles that we apply in measuring discipline are equally familiar. We consider the nature and severity of the offense and whether it is related to the practice of law. We consider evidence of an attorney's good reputation, prior trustworthy professional conduct, and general good character.

In applying those principles to the underlying facts, we find that although the offense did not directly touch on the practice of law, it had an effect on respondent's practice of law and his municipal court office. *See In re Kotok,* 108 *N.J.* 314, 333, 528 *A.*2d 1307 (1987) (misrepresentation by attorney who is a municipal court judge adversely reflects on his judicial role). In the context of application for admission to the bar, we have said that an applicant "must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice." *In re Matthews,* 94 *N.J.* 59, 77, 462 *A.*2d 165 (1983). Those traits require adherence to the disciplinary rules that govern attorney conduct. We have described those rules as the "fundamental norms that control the professional and personal behavior of those who as attorneys undertake to be officers of the court." *Id.* at 78, 462 *A.*2d 165. In this case, we find a clear transgression of those fundamental norms. Respondent candidly admits that staging his death was an act of dishonesty that conveyed to his family and the public a fact that was not true. His abandonment of his municipal court

office, his law partner, associate, and clients demonstrated a lack of trustworthiness and reliability.

Respondent emphasizes the essential personal nature of his transgression and that his clients were not, in fact, injured, nor was the administration of justice in Morris Plains injured. He analogizes the case to that of an attorney having an affair. Surely such conduct contains an element of misrepresentation but not one that should concern our ethics boards. But, as we have seen, there was more to this incident than a private liaison. He argues further that he could not have foreseen the intensive police manhunt that followed his "disappearance" with the attendant expenditure of public funds and diversion of police from needed public-safety measures. Even if we were to credit this last theory, there was evidence to refute this claim. Respondent met with Ms. Heath several times in Maryland and was aware that authorities were questioning her. Respondent must have realized that Ms. Heath was being questioned because the authorities were looking for him. We were informed at oral argument that the public authorities thought the episode sufficiently serious to convict Ms. Heath of obstructing justice. To find Ms. Heath guilty of obstructing justice and to excuse respondent's conduct in this affair would reverse the roles that they actually played. There is no evidence that Ms. Heath was the protagonist in this affair.

Nor can we agree that partners, clients, and the public are not injured when the conduct of a lawyer and part-time municipal court judge causes weeks of uncertainty and disruption. In measuring discipline, then, we need not take into account the consequences of respondent's misrepresentation on his now-supportive family. We have long and firmly held that " '[i]n the legal profession there must be a reverence for the truth.' " *In re Jenkins,* 94 *N.J.* 458, 470, 467 *A.*2d 1084 (1983) (quoting *In re Hyra,* 15 *N.J.* 252, 254, 104 *A.*2d 609 (1954)). A false certification by an attorney in a legal matter is a serious offense. *See In re Pleva,* 106 *N.J.* 637, 645, 525 *A.*2d 1104 (1987) (noting instances of suspension for such misconduct).

Thus, a lack of candor even when "no one was seriously hurt, and the court was not actually misled," may warrant a suspension. *In re Kernan*, 118 *N.J.* 361, 368, 571 *A.*2d 1282 (1990) (three-month suspension). Although the misrepresentation here did not occur in a legal matter it had significant effects.

Finally, we must take account of the fact that respondent's conduct occurred while he was a municipal court judge and thus adversely reflects on his judicial role. *In re Kotok, supra*, 108 *N.J.* at 333, 528 *A.*2d 1307. He abandoned his judicial office and disappeared from the community. He expressed unambiguously thereby his abandonment, albeit temporarily, of the traits that bear on the fitness to practice law, namely, honesty, truthfulness, trustworthiness, and reliability, and a professional commitment to the judicial process and the administration of justice. In *In re Kotok*, we would have imposed a one-year suspension for offenses that included an earlier misrepresentation by one serving as a municipal court judge but for the remoteness of the charges (almost ten years before the proceedings). 108 *N.J.* at 331–32, 528 *A.*2d 1307.

A suspension of six months is warranted. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, GARIBALDI, and STEIN—5.

*Opposed*—None.

## ORDER

It is ORDERED that FRANCIS A. BOCK of MORRISTOWN, who was admitted to the bar of this State in 1959, is hereby suspended from the practice of law for a period of six months for engaging in conduct involving dishonesty, fraud or

misrepresentation, and conduct prejudicial to the administration of justice, in violation of *RPC* 8.4(c) and (d), effective July 20, 1992, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.