638 A.2d 801

IN THE MATTER OF FRANK J. HOERST,
III, AN ATTORNEY AT LAW.

Argued January 5, 1994—Decided February 18, 1994.

*Richard J. Englehardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Edward N. Fitzpatrick,* argued the cause for respondent (*Clapp & Eisenberg,* attorneys).

PER CURIAM.

The Office of Attorney Ethics (OAE) brought a motion before the Disciplinary Review Board (DRB or Board), seeking final discipline based on respondent's criminal conviction. See *Rule* 1:20–6(c)(2)(i). The DRB recommended that this Court impose a public reprimand, with two members voting to recommend a six-month suspension. Our independent review of the record leads to the conclusion that respondent should be suspended from the practice of law for six months.

I

Respondent, Frank J. Hoerst, III, was admitted to the New Jersey bar in 1974. In 1983 the Governor appointed him Prosecutor of Salem County, in which post he served until his resignation in March 1991 as part of a plea agreement on a charge of violating *N.J.S.A.* 2C:20–9, a "theft" offense.

Because of suspected fiscal mismanagement in the Salem County Prosecutor's office, the Attorney General took control of that office in November 1989. Following an audit, the Division of Criminal Justice concluded that about $380,000 from Salem County's forfeiture fund had been spent without adequate documentation or justification. Forfeiture funds had been set up in all twenty-one counties to receive monies forfeited on the convictions

of drug dealers and other criminal offenders. See *N.J.S.A.* 2C:64–6. Under that statute all money seized becomes "the property of the entity funding the prosecuting agency involved," and shall be "used solely for law-enforcement purposes * * *." The statute also authorizes the Attorney General to promulgate rules and regulations to implement and enforce its provisions.

In June 1990 a state Grand Jury returned a seven-count indictment charging respondent with one count of second-degree official misconduct, a violation of *N.J.S.A.* 2C:30–2; five counts of third-degree theft by failure to make required disposition of property received, contrary to *N.J.S.A.* 2C:20–9; and one count of third-degree theft by deception, a violation of *N.J.S.A.* 2C:20–4. All the counts of the indictment involved a total of $15,000, not the greater sum of $380,000 mentioned above.

Respondent pleaded guilty to the fourth count, one of the counts charging him with theft by failure to make required disposition of property received, a violation of *N.J.S.A.* 2C:20–9. That statute reads in pertinent part as follows:

> A person who purposely obtains or retains property upon agreement or subject to a known legal obligation to make specified payment or other disposition * * * is guilty of theft if he deals with the property obtained as his own and fails to make the required payment or disposition. * * *. An officer or employee of the government or of a financial institution is presumed: (a) to know any legal obligation relevant to his criminal liability under this section, and (b) to have dealt with the property as his own if he fails to pay or account upon lawful demand, or if an audit reveals a shortage or falsification of accounts.

The factual circumstances supporting respondent's guilty plea started with his withdrawal of about $7500 from the Salem County forfeiture fund to pay for a trip to California, in August 1988, for himself, his female companion (now his wife), Salem County First Assistant Prosecutor Francis A. Paladino, Jr., and Paladino's wife. The ostensible purpose of the trip was to attend a Capital Litigation Conference in San Francisco, sponsored by the National College of District Attorneys. The money taken from the forfeiture fund was used to cover the foursome's expenses, including air fare, lodging, and meals. According to Paladino's testimony before the Grand Jury, the conference was a two- or three-day affair,

prior to which the group spent about three days in Monterey. As Paladino described it, the "retreat" in Monterey was "rather casual," with no set agenda for discussion of office matters, although he and respondent did discuss some pending cases, including a capital case. Paladino saw nothing amiss in the use of forfeiture funds to pay the expenses of his wife and respondent's companion in view of "the policy in the office for paying, and this is under two administrations, I believe, for attendance of spouses at conventions." The previous "conventions" to which he referred were the annual County Prosecutors' conferences, conducted in New Jersey.

Respondent's agreement to plead to a single count of the indictment contained the provision that respondent would apply for entry into the Camden County Pretrial Intervention Program (PTI), and that the State would oppose entry into that program but would not appeal the court's decision were respondent admitted into PTI. The agreement further required respondent to pay $7500 in restitution (the plea transcript reads "$8500," but all references in the briefs and the DRB Decision and Recommendation are to $7500) and to resign as Salem County Prosecutor. On respondent's application, and over the objection of the Attorney General but with the recommendation of the PTI supervisor, the court admitted respondent into the PTI program. Respondent completed a one-year counselling program and performed 100 hours of community service as provided by the PTI program. On January 4, 1993, the court issued an order expunging his conviction. Respondent currently is a sole practitioner in Salem County.

The OAE, which asked the DRB to recommend to this Court that respondent receive public discipline, has candidly acknowledged the difficulty of assessing the appropriate measure of discipline.

## II

The DRB found, as do we, that respondent's guilty plea establishes that he had engaged in criminal conduct that adversely

reflects on his fitness to practice law, in violation of *RPC* 8.4(b). Pointing out that respondent's conduct reflected unfavorably on "the entire governmental system" because "the public perceives any misdeeds by a government attorney as that of the government itself," the DRB also emphasized the harm to the public, to whom respondent owed "his undivided loyalty and zeal." Said the DRB: "The injury to the public was greater because respondent was a public official. When a member of the bar acts corruptly in the exercise of his or her official service, the public injury is intensified."

Turning to mitigating factors, a relevant and appropriate consideration in this context, *e.g.*, *In re Mirabelli*, 79 *N.J.* 597, 602, 401 *A.*2d 1090 (1979), the DRB concluded as follows:

> These proceedings are the only blot in respondent's otherwise stainless professional career. Respondent has served the public's interest with distinction and has enjoyed an unblemished reputation among his peers and public members alike. Approximately seventy letters were filed with the Board attesting to respondent's impeccable reputation as an attorney and as an individual, to the invaluable service he has rendered to the public, to the numerous civic and community activities to which he committed himself, and to the great esteem and respect in which his clients, friends, other attorneys, and law enforcement officials still hold him.

In addition, the DRB took into account the fact that although, under the pertinent forfeiture statute, *N.J.S.A.* 2C:64–6, the Attorney General "is authorized to promulgate rules and regulations to implement and enforce provisions" of that statute, at the time of the events giving rise to these proceedings the Attorney General had not yet promulgated any guidelines in connection with official trips taken by members of a prosecutor's office and spouses. Finally, the DRB noted that respondent had been declared eligible for PTI and had successfully completed the program, which the Board considered evidence of "no serious culpability" and of respondent's full amenability to rehabilitation and self-correction, relying on *In re Whitmore*, 117 *N.J.* 472, 479–80, 569 *A.*2d 252 (1990). The DRB declared that in light of the mitigating circumstances, to which it accorded "great weight," its recommendation was for a public reprimand.

## III

As was the DRB, we are impressed by the evidence of respondent's long and distinguished career both at the bar and in public service, and particularly by the outpouring of support as disclosed in the many letters attesting to respondent's character and legal ability. We are mindful as well of the respondent's cooperation with law-enforcement authorities from the beginning of the investigation into the forfeiture account. We recognize also that respondent has been rehabilitated.

Despite all the foregoing, however, we are left with the fact that in the discharge of his public duties, respondent, the chief law-enforcement officer of Salem County, violated the very law that he had sworn to uphold. He admits having committed a third-degree theft offense. Respondent's brief argues that given the prior use of forfeiture funds to pay for the attendance of spouses and guests at prosecutors' conventions, his conclusion that the trip to California was "not an inappropriate use of forfeiture funds" amounted to a "judgmental error." Aside from the obvious differences between attendance at an in-state convention and a journey to the west coast with a three-day side trip sandwiched in, the offense to which respondent entered a plea represents far more than an error in judgment. Moreover, we are not free to disregard a conviction because of some perceived weakness in the underlying proofs; it is the judgment of conviction that establishes the gravity of the offense. *In re Iulo*, 115 *N.J.* 498, 510, 559 *A.*2d 1349 (1989).

The essential nature of all "theft" offenses is " 'the "involuntary transfer of property"; the actor appropriates property of the victim without his consent or with consent obtained by fraud or coercion.' " *State v. Talley*, 94 *N.J.* 385, 390–91, 466 *A.*2d 78 (1983) (quoting 2 New Jersey Criminal Law Revision Commission, *Final Report*, at 216 (1971) (commenting on *N.J.S.A.* 2C:20–2)). The offense to which respondent entered a guilty plea is committed when a person (1) purposely obtains or retains proper-

ty (here, the forfeiture fund) upon agreement or subject to a known legal obligation to make specified payment or other disposition (here, the duty imposed by *N.J.S.A.* 2C:64–6 to use the fund "solely for law enforcement purposes"); (2) deals with the property obtained as his own (here, to include guests in a convention trip and incidental excursion); and (3) fails to make the required payment or disposition. *State v. Kelly,* 204 *N.J.Super.* 283, 287, 498 *A.*2d 784 (App.Div.1985). For purposes of *N.J.S.A.* 2C:20–9, "the initial taking [of the property] is authorized but at a later time a theft occurs when the property is converted to the possessor's own use." *State v. Dandy,* 243 *N.J.Super.* 62, 64–65, 578 *A.*2d 881 (App.Div.1990). The offense established by the plea is serious indeed, one that cannot be dismissed as simply a lapse in judgment.

We previously imposed a period of suspension on an assistant prosecutor who had violated his oath by removing drugs from the evidence room, by using those drugs himself and by making them available to others, by actively participating in bail proceedings on behalf of a person charged with a criminal offense, and by providing information helpful to the defense of persons in whose prosecution he participated. See *In re Farr,* 115 *N.J.* 231, 237–38, 557 *A.*2d 1373 (1989). The respondent in that case, who also had been admitted to PTI, was young, immature, and had experienced a period of extreme personal stress, during which "he lost his ethical compass and went astray." *Id.* at 237, 557 *A.*2d 1373. So serious were the offenses, we determined, that a six-month suspension was appropriate.

Unlike Farr, respondent was mature, experienced, seasoned, and, so far as the record discloses, not suffering from any serious stress that could have played a role in his offense. Were it not for the absence of any guidelines from the Attorney General's office on how the forfeiture statute, *N.J.S.A.* 2C:64–6, should be implemented—a situation that has been rectified, see *N.J.A.C.* 13:77–1.1 to –7.1—we would likely impose at the least an extended period of suspension. Under the circumstances, however, we deem the

appropriate discipline to be that respondent be suspended from the practice of law for six months. In addition, respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7, join in this opinion.

*Opposed*—None.

### CORRECTED ORDER

It is ORDERED that **FRANK J. HOERST, III, of WOODSTOWN,** who was admitted to the bar of this State in 1974, is hereby suspended from the practice of law for a period of six months, and until the further Order of the Court, effective March 11, 1994; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.