640 A.2d 837

IN THE MATTER OF SAMUEL ASBELL,
AN ATTORNEY-AT-LAW.

Argued March 15, 1994—Decided May 13, 1994.

*William Wood,* Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Carl Poplar* argued the cause for respondent (*Poplar & Eastlack* and *Koslov, Seaton, Romanini & Brooks,* attorneys; *Teri S. Lodge,* on the brief).

PER CURIAM.

Respondent, Samuel Asbell, is a former Camden County Prosecutor who staged an assassination attempt on his own life. He

pleaded guilty to knowingly filing a false police report contrary to *N.J.S.A.* 2C:28–4a. In this proceeding, respondent, notwithstanding his guilty plea and admitted violation of several ethical rules, asserted the defense of insanity. He voluntarily withdrew from the practice of law until psychiatrists could evaluate his mental capacity. We permitted him to resume practicing law under the supervision of a proctor, provided that he not practice in the public sector. The District XIV Ethics Committee (Committee) recommended a public reprimand, and the Disciplinary Review Board (DRB) recommended a suspended two-year suspension. A minority of the DRB recommended an unqualified one-year suspension.

In light of respondent's serious ethical misconduct, we conclude that the appropriate discipline is a two-year suspension from the practice of law. Contrary to the recommendation of the DRB, the suspension is not to be suspended.

–I–

Our reading of the record is substantially similar to that of the DRB. Respondent was admitted as a member of the New Jersey Bar in 1969. On December 17, 1984, he was appointed Camden County Prosecutor, a position in which he served until his resignation on January 5, 1990.

During his tenure as county prosecutor, respondent developed a reputation as a colorful prosecutor who enjoyed his position. Basking in the media limelight, respondent deeply enjoyed his job.

At the time of the relevant events, December 1989 and January 1990, respondent was a holdover prosecutor, his term of office having expired. A Republican, respondent hoped that he might be reappointed by then Governor-elect Jim Florio, a Democrat. In the alternative, respondent hoped that a new statewide position might be created for him as a "drug czar"—an official in charge of overseeing all narcotics operations in New Jersey. His hopes were unfounded: respondent conceded that he had never been told that he would either be reappointed as prosecutor or appointed as drug czar.

For one week during the December 1989 holidays, respondent and his family vacationed in Vail, Colorado. Throughout that vacation, respondent experienced considerable stress and anxiety for having absented himself from New Jersey at such a crucial time in his career. According to respondent, those feelings lasted "[f]rom the day I left until the day I got back." He explained that he "was afraid to leave for fear somebody—something would come up that would have something to do with my position and that I wanted to be there." Asked at the ethics hearing how much he had thought about his future while in Vail, respondent replied: "I would—I was calling the office, I was calling various people, I was calling the freeholders, I was constantly on the phone, whenever I would come to a place where there was a phone I was making telephone calls."

On December 30, 1989, respondent and his family returned to New Jersey. The next day, December 31, 1989, respondent and his wife attended a New Year's Eve party at a friend's home in Cherry Hill. Respondent knew that Governor-elect Florio, whom respondent had met when both practiced law in Camden County, would be one of the guests. According to respondent, he "perceived that this would be an opportunity for the [G]overnor elect and I to talk and get my future straightened out." Nevertheless, despite respondent's hopes and expectations, his contact with Florio on that night did not extend beyond salutations and congratulatory remarks on the election.

Florio left the party shortly after midnight. Respondent stayed on until 3:00 a.m. He then went home, slept until 7:00 a.m., and at 8:00 a.m. went jogging with two of his friends. Thereafter, respondent and his wife attended a brunch at a friend's house. After the brunch, respondent took his wife home and drove to his Camden office to inspect his mail. Respondent explained, "[w]henever I was out of the office for any period of time I always wanted to go through my mail and I knew I had to be places that week so I planned to go to do my mail and then I wouldn't have to worry about it." Arriving at his office at 3:00 or 3:30 p.m.,

respondent opened his mail and dictated several letters to his secretary.

Respondent left the office between 4:00 and 4:30 p.m., carrying two service weapons: a .380–caliber automatic pistol and a .12–gauge shotgun. In addition, he had placed in his briefcase an unregistered .45–caliber pistol with two clips containing six shots each. He left another, registered, .45–caliber pistol at his office. The pistols were part of respondent's extensive private collection of firearms. Respondent had removed the unregistered pistol from a cardboard box located in the crawl space of the basement in his house, where he also kept eight other pistols.

Once in his automobile, respondent telephoned his wife to let her know that he would be home in ten or fifteen minutes. Respondent then drove to a deserted area in South Camden on Front Street, near the intersection of Kaighn Avenue. According to respondent, he had driven impulsively to that area, after having made a right turn on Route 676 instead of his customary left turn. He explained that he had "just [driven] down there" and said "gee, this looks like a nice spot." He then grabbed the .45–caliber pistol from his briefcase, left the car, walked across the street until he was standing fifteen or twenty feet from his car, and fired seven rounds into the county-owned Lincoln Town Car. The incident caused $6,500 in damages.

After shooting his automobile, respondent re-entered the car, grabbed his .380–caliber service pistol and fired it into the ground. He then drove for approximately one mile, stopped the car for a moment on a main street, took out the .12–gauge shotgun from the car trunk and fired it into the ground. He returned the shotgun to the trunk, drove to the Camden City Police Station, and sat in the parking lot for an indeterminate period of time. After knocking on the back door, he was admitted into the police station. He was clutching his briefcase, in which he had placed the .45–caliber pistol. He refused offers of the police officers to hold the briefcase for him.

Over the next three days, respondent gave the police misleading accounts of the shooting incident. In his statements, respondent recounted how, on leaving the Parkade Building where his office was located, he had noticed a green Toyota station wagon parked nearby with two occupants. When respondent approached the intersection of Federal and Fifth Streets, the Toyota accelerated toward respondent's car and proceeded to chase it to the Camden waterfront at a high rate of speed. When respondent neared Second Street, the assailants shot out the rear window of the car, sending flying glass onto the dashboard. At that point, respondent entered Front Street and accelerated, but slid on the ice on the railroad tracks. It was then that he

> heard the burst of the automatic weapon which just sounded like a burp and all hell broke loose in my car and glass was flying all over the place and the car pulled up along side and I saw the passenger raise his weapon; I just stuck the sawed off shotgun out the window and let go. I saw the passenger go forward and it appeared to me as if a mellon [sic] was exploding. I thought I saw glass shatter * * * but it was possible that there was not glass shattering it was just the charge of the 12 gauge shotgun hitting the passenger. I couldn't get my finger into my rear trigger to take another shot and the car was beginning to accelerate towards Kaighn Avenue. I pulled my 380, I remember hitting the door with my shoulder and glass coming on top of my arm and then I opened the door and began and continued to fire as the car proceeded around Front and Kaighn and I must have gone back because I remember running up to the corner and firing a shot at the corner, pulling the trigger and my slide was back and I saw the car driving eastbound on Kaighn Avenue way up passed [sic] Second * * *.

Respondent also told police that, in the course of the prior several years, he had received numerous death threats and that a mere ten days before, on December 21, 1989, an attempt had been made on his life when he was driving out of the Parkade Building and turning left onto Fifth Street. That incident had left two bullet holes in his car.

Based on respondent's version of the events, the New Jersey State Police, Camden City Police, and investigators from the Camden County Prosecutor's Office began a massive investigation. According to the testimony of several of those officers and investigators, however, respondent's tale rang false from the start. Police investigators uncovered physical evidence of the position of the .45-caliber shell casings at the scene of the incident that were

inconsistent with respondent's description. Police investigators also obtained a statement by an eyewitness, Ronald Moorer, who had seen a large, dark automobile—not two cars—operated by a white male drive up at a normal speed onto Front Street close to where he was standing. When Moorer heard shots, he yelled, fearing for his safety. He then saw the same vehicle speed away with the rear window shot out.

While the investigation was being conducted, respondent proceeded with his normal official functions, albeit with police protection. He also spoke about the incident at a press conference, despite urging to the contrary by Lieutenant Robert Dunlop of the Major Crimes Unit of the New Jersey State Police and by Dennis Wixted, Esq., the county's first assistant prosecutor.

By the third day of investigations, January 4, 1990, the police were convinced that respondent had staged a hoax. They asked him to go to the Bellmawr Barracks, New Jersey State Police Intelligence Office. Present were Lieutenant Dunlop and Major Olindo Tezo, an investigations officer. When confronted with overwhelming evidence against him, respondent at first denied any wrongdoing. He continued his denial even when informed that the police had located an eyewitness, Mr. Moorer. When he learned, however, that the police had prepared an application for a warrant to search his house for the .45–caliber pistol, respondent confessed. He admitted that he had staged an assassination hoax.

In his statement to the police, respondent gave the following account of the incident:

On December 21, 1989, there was an attempt on my life when I was operating my motor vehicle, when I was exiting the Parkade Building and, making a left on Fifth Street. Subsequent to that situation, I went on vacation and when I came home, I just thought about doing this on New Year's Day. So I took a 45 automatic, and loaded it, and proceeded to drive down to Front Street, and I got out of the car and I walked across the street, and I got back into the car and I drove to the police station. It was as simple as that. * * * If you were to ask me why, or what was the reason, I don't have any. I honestly don't have any.

Respondent stated that he had intended to confess the truth about the incident when he gave his initial statement to the Camden City police and on every day following that evening, but he did not

know how to do it. After completing his statement to the police, respondent left the room and walked up to William Latham, a long-time associate, shook his hand, and apologized for the embarrassment he had caused him and others in the Prosecutor's Office. Investigator Latham stated that respondent had said to him that "he just wanted his job so bad."

Directly from the Bellmawr Barracks, respondent went to the Carrier Clinic for treatment. In his progress notes, Dr. Michael L. Kropsky, a psychiatrist at the Carrier Clinic, wrote the following:

> The patient indicated that on December 21st his car had apparently been shot at as he discovered what seemed to be a bullet in it. He said that he does not think he was in the car at the time and if he was he would have thought it was just a stone. He said that this gave him the idea which eventually led to the incident on January 1st. When he initially had the idea he said that he thought to himself how crazy it was. He then thought about it again when he was on a ski vacation in Colorado and said that the second time he thought about it it did not seem so crazy. * * * He says that he realizes that there was no chance that his story would be believed but at the time he did not think about that.

Respondent spent nineteen days at the Carrier Clinic, nine days fewer than the average twenty-eight-day stay for patients. He was released on January 24, 1990. Dr. Kropsky's final diagnosis was "adjustment disorder with mixed disturbance of emotions and conduct," and "mixed personality disorder with histrionic and narcissistic features." Dr. Kropsky's final diagnosis also included the following language: "[r]ule out brief reactive psychosis."

On his release, respondent voluntarily agreed not to practice law pending a determination of his mental capacity to practice law. Dr. Kropsky referred him to Dr. H. Charles Fishman, a clinical psychiatrist in Philadelphia, for therapy. Dr. Fishman conducted approximately seventy sessions with respondent, some of which included respondent's family. Dr. Fishman ultimately concluded that respondent was mentally fit to practice law.

Respondent advised the Office of Attorney Ethics (OAE) that he intended to resume his practice. The OAE objected and filed a motion for respondent's temporary suspension on June 6, 1990. On July 11, 1990, after respondent had consented to his continued

withdrawal, this Court deferred the OAE's application for ninety days, during which time the OAE was to finish its investigation and file a supplemental report. By order dated December 20, 1990, the Court denied the OAE's application and allowed respondent to resume his practice of law under proctorship. The order also contained a restriction against respondent's legal employment in the public sector. Since then, respondent has practiced law in Collingswood, Camden County.

In an accusation, the Attorney General's office charged respondent with the fourth-degree crime of filing a false police report in violation of *N.J.S.A.* 2C:28–4a. Pursuant to a plea agreement, on April 24, 1990, respondent admitted his guilt and agreed to make restitution of $12,000 in partial compensation for the cost of the police investigation and the damage to his county-owned automobile. Respondent also agreed to refrain from possessing or using firearms for a period of three years. In exchange for respondent's admission of guilt, the Attorney General's Office agreed not to object to respondent's application for admission into the pretrial intervention program (PTI).

When entering his guilty plea, respondent admitted that he had knowingly given or caused to be given false information to a law-enforcement officer—Lieutenant Dunlop—with the purpose of implicating two fictitious persons in the assassination attempt on his life. Specifically, respondent acknowledged that

> [d]uring the first few days of January [1990] I reported to the Camden City and New Jersey State Police that I was shot at by unknown individuals. This information was not accurate and led to my filing a false police report. I deeply regret that this happened and I am truly sorry for the anguish that these events have caused my family, friends and colleagues. Through medical help I now realize that my actions were as a result of a combination of many factors not known to me at the time. Through counseling and guidance I have come to understand the causes and reasons for my actions and believe that no such conduct will ever occur again.

When the court asked respondent if he was entering a plea of guilty because he was guilty, respondent replied, "yes, sir." On September 17, 1990, the court admitted respondent into PTI, with a three-year probationary period.

The OAE's complaint charged respondent with official misconduct in violation of *N.J.S.A.* 2C:30–2a, *RPC* 8.4(b) ("commit[ting] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects"), *RPC* 8.4(c) ("engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"), and *RPC* 8.4(d) ("engag[ing] in conduct prejudicial to the administration of justice") (count one); possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4a, *RPC* 8.4(b), *RPC* 8.4(c), and *RPC* 8.4(d) (count two); criminal mischief in violation of *N.J.S.A.* 2C:17–3a(1), *RPC* 8.4(b), *RPC* 8.4(c), and *RPC* 8.4(d) (count three); and the filing of a false report to law-enforcement authorities in violation of *N.J.S.A.* 2C:28–4a, *RPC* 8.4(b), *RPC* 8.4(c), and *RPC* 8,4(d) (count four).

At the ethics hearings before Special Master A. Jerome Moore, respondent admitted all of the factual allegations contained in the complaint except the allegation that he had hidden a .45–caliber semi-automatic pistol in the crawl space of the basement in his house. Respondent admitted only that he had placed the pistol there. Additionally, respondent denied all allegations that he had knowingly staged an assassination attempt on his life, and asserted insanity and diminished capacity as an affirmative defense. Respondent also contended that the OAE was estopped from alleging any violations of criminal or quasi-criminal laws by virtue of his plea agreement. Finally, respondent argued that "constitutionally, once the affirmative defense of insanity and/or diminished responsibility is raised, and has been proven by [a] preponderance of the evidence, the burden of proof then shifts to the Complainant to show that the Respondent was mentally responsible for the acts alleged to warrant disciplinary action."

After ten days of hearings, during which he heard testimony from three psychiatrists, the Special Master granted the OAE's motion to strike the insanity defense. The basis for granting the motion was that the defense was inconsistent with respondent's guilty plea, in which he admitted filing a false report with law-enforcement authorities, an offense that requires knowledge. Ad-

ditionally, the Special Master also found that respondent's admission of guilt was, in effect, "an admission of all the events of January 1, 1990 and thus a violation of the Rules of Professional Conduct set forth in the formal complaint, Counts One, Two, Three and Four, *RPC* 8.4(b)(c)(d)."

The Special Master also concluded that in an attorney disciplinary matter, an unconditional plea of guilty resulting in the defendant's admission to PTI has the same effect as a criminal conviction. As noted by the Special Master:

> The Supreme Court has on numerous occasions emphasized that one of the central goals of attorney discipline is to maintain public confidence in the bar, the professionalism of its members, the judiciary, and the Court. I find that the public confidence in the bar would be greatly undermined if a member of the bar were permitted to enter an unconditional guilty plea to a criminal charge in open court and then turn around and argue that the plea cannot be used in a disciplinary proceeding.

Concerning respondent's argument that the burden of proof remained with the OAE to establish by clear and convincing evidence culpability of a respondent who raises insanity as an affirmative defense, the Special Master withheld consideration as mandated by *Rule* 1:20–3(i). The Special Master ruled, however, that

> [f]or the purpose of this report, I specifically find, based on the testimony of the doctors and the evidence, that if the burden of proof rests with the OAE, then they have met their burden. If the burden of proof rests upon Mr. Asbell, then he has not met that burden, thus the affirmative defense of insanity and/or diminished responsibility must fail for lack of believable medical testimony.

Finally, the Special Master found that, if the guilty plea did not have the effect of an admission of all charges, the record supported the finding that respondent's conduct was clearly unethical and that respondent had consciously and knowingly violated the Rules of Professional Conduct. The Special Master recommended the imposition of public discipline. As stated in the Special Master's Report:

> The conduct alone requires such a recommendation and the additional factor that Mr. Asbell was [a] prosecutor at the time almost [sic] demands such treatment. Mr. Asbell's prior excellent conduct must be set aside and public discipline

recommended in order to attempt to maintain public confidence in the profession and the court.

–II–

The DRB affirmed the Special Master's findings and conclusions. It agreed with the Special Master that respondent's misconduct was particularly egregious because of his status as a county prosecutor, the chief law-enforcement officer in Camden County. His actions embarrassed all public officeholders, particularly county prosecutors, and betrayed the public trust. The DRB stated that "[i]n order to preserve the public faith in the profession and in the judicial system, stern discipline must be imposed." We agree.

The DRB, however, did not recommend that respondent be disbarred. Nor did it recommend that respondent be suspended from practicing law. Instead, a four-member majority of the DRB recommended a suspended two-year suspension with a proctorship and psychiatric treatment. To support its conclusion, the DRB majority referred to mitigating circumstances, including respondent's lengthy and prior unblemished legal career, his service and dedication to the profession, his excellent reputation and good moral character, his extreme commitment and attachment to his position as prosecutor, the aberrational nature of the incident—a product of psychological impairment and poor judgment, and the ignominy he has suffered as a result of his transgressions.

Three members of the DRB would have imposed a one-year active suspension to preserve the public confidence in the bar and in the judicial system and to avoid the perception that respondent was being favored with an "overdose of judicial indulgence." Those three members also would recommend a one-year proctorship and concurrent psychiatric care.

–III–

Like the DRB, we are persuaded by the evidence that respondent should not be disbarred. Notwithstanding his bizarre con-

duct in staging an attempted assassination on his own life, respondent remains a respected member of the bar. Before the event that gives rise to this proceeding, he was an active member in the Camden County Bar Association and served as its president. Several witnesses, including fellow county prosecutors and other colleagues, testified to respondent's excellent character and high standard of honesty and integrity. The incident at issue, which apparently transpired during a time of great stress, was an aberration in respondent's twenty-five-year career. Considerable testimony revealed that respondent may have suffered a psychological disorder. Although that testimony does not support a defense of insanity, it suggests that respondent's conduct was aberrant. As we reasoned in *In re Farr*, 115 *N.J.* 231, 557 *A.*2d 1373 (1989), when the cause of ethical transgressions seems to be " 'some mental, emotional, or psychological state or medical condition that is not obvious and * * * could be corrected through treatment' ", the respondent "need not be disbarred to preserve confidence in the bar or to protect the public." *Id.* at 237, 557 *A.*2d 1373 (quoting *In re Templeton*, 99 *N.J.* 365, 374, 492 *A.*2d 1001 (1985)). That exception, however, does not apply to the knowing misappropriation of funds. *In re Skevin*, 104 *N.J.* 476, 517 *A.*2d 852 (1986).

To maintain public confidence in the profession and the court, however, we must balance respondent's record with the gravity of his ethical misconduct. *See In re Bock*, 128 *N.J.* 270, 275, 607 *A.*2d 1307 (1992). As in *Farr*, mitigating evidence that includes evidence of mental or emotional weakness during a time of extreme stress does not preclude a suspension when the facts as presented demonstrate serious ethical infractions. *See also Bock*, *supra*, 128 *N.J.* at 274, 607 *A.*2d 1307 (stating that stress-induced anxiety unravels in light of calculated acts of misconduct). Here, respondent planned a fictitious assassination attempt on his own life for his own personal gain. He meticulously prepared for the incident by retrieving an unregistered .45–caliber pistol, loading it, and taking it with him to the Parkade Building. Then, he fired seven rounds of his weapon into his county-owned car, causing

$6,500 in damages. He knowingly gave erroneous information to police investigators and filed a false report, a fourth-degree crime in violation of *N.J.S.A.* 2C:28–4a, with the purpose to implicate others and with the effect of instigating a costly investigation. He called a press conference, at which he related the fabricated events to the media with the vain hope of winning public sympathy in an attempt to encourage his reappointment as a county prosecutor. As evidence mounted against him, he adhered to his fabricated story, finally revealing the truth only when the police informed him that they had a search warrant for his home. This evidence clearly and convincingly establishes misconduct, dishonesty, fraud, deceit, misrepresentation, and conduct prejudicial to the administration of justice in violation of *RPC* 8.4(b), (c), and (d). Balanced against respondent's otherwise unblemished record, his misconduct, although aberrational, requires an extended period of suspension.

Respondent argues that his conduct did not put the public at risk and did not directly relate to the practice of law. In *Bock,* however, we faced a similar situation. There, a municipal court judge faked his own death. We concluded that a suspension was appropriate although the offense did not directly touch on the practice of law. 128 *N.J.* at 275, 607 *A.*2d 1307. Because Bock's misrepresentation had occurred while he was a member of the bench, we concluded that it adversely reflected on his judicial role. *Id.* at 277, 607 *A.*2d 1307. So here, respondent's faked assassination attempt reflects adversely on all prosecutors.

Respondent's misrepresentations, like Bock's, adversely affected the public interest. Respondent, like Bock, caused uncertainty resulting in a massive investigation. In *Bock,* we stated that we could not "agree that partners, clients, and the public are not injured when the conduct of a lawyer and part-time municipal court judge" caused such disruption through his lack of candor. *Id.* at 276, 607 *A.*2d 1307. Here, respondent caused the same kind of disruption. In the face of mounting evidence, he constantly misrepresented facts during the investigation. We cannot counte-

nance his continued deception of the public and law-enforcement authorities.

Respondent further argues that he has already been disciplined adequately for his admitted transgressions because of his voluntary withdrawal from the practice of law. We reject this argument. In *Farr*, we expressly noted that a voluntary suspension would not be considered a mitigating factor unless imposed by order of this Court. *See Farr, supra,* 115 *N.J.* at 238, 557 *A.*2d 1373. Respondent's voluntary suspension was not pursuant to an order by this Court. Therefore, the period of time that respondent voluntarily suspended himself cannot be considered as a form of discipline.

Finally, respondent argues that compared to similar cases, an extended period of suspension for his misconduct would be disproportionate. He bases his argument on the mitigating evidence of his past conduct, his dedication to the bar and to his office, and on the psychiatric evidence indicating a mental impairment during extreme stress. We believe, however, that an extended period of suspension is not disproportionate.

In *Farr*, we imposed a six-month suspension on an assistant prosecutor because of a bizarre incident in which he removed from the prosecutor's evidence room drugs that he used himself and provided to others for their use. Infatuated with a woman who was a criminal defendant, Farr committed various acts of misconduct to ingratiate himself with her. Finally, he falsely introduced her as an employee of the prosecutor's office and allowed her to accompany him on a narcotics investigation. 115 *N.J.* at 237–38, 557 *A.*2d 1373. We were persuaded, however, that Farr's naive, immature character rendered him susceptible to manipulation during a time of extreme personal stress. *Id.* at 233, 237, 557 *A.*2d 1373.

Most recently, in *In re Hoerst,* 135 *N.J.* 98, 638 *A.*2d 801 (1994), we imposed a six-month suspension on a Salem County prosecutor who pleaded guilty to theft of forfeiture funds to finance a trip to California for himself and his female companion. The record did not indicate that Hoerst suffered from any stress at the time of his

infraction. Hoerst, unlike Farr, was "mature, experienced, seasoned." We would have imposed an extended period of suspension on Hoerst if at the time of his offense the Attorney General had provided guidelines to prosecutors on the implementation of the forfeiture statute.

Like Farr, this respondent suffered stress concerning his career, and like Farr, respondent participated in aberrational behavior. But unlike Farr, respondent is not a young, naive lawyer. He is a seasoned attorney, like Hoerst. Furthermore, although respondent was obsessed with continuing as the county prosecutor, the record indicates that at the time of the feigned assassination attempt, he conducted himself rationally in professional and social situations. The psychiatric testimony was contradictory with regard to respondent's claim of insanity. Neither the Special Master nor the DRB was persuaded by the testimony of respondent's doctors. Finally, unlike in *Hoerst*, respondent did not need guidelines to know that his conduct was dead wrong. Under these circumstances, we believe that a two-year suspension is appropriate.

We recognize that a suspension will disrupt respondent's professional life and his ability to serve his clients. At first glance, our refusal to suspend him during the pendency of this proceeding may seem inconsistent with the suspension that we now order. We granted respondent permission to resume his practice, however, at a time when his ethical violations had not been fully investigated. Now, we are better informed. To maintain confidence in the disciplinary system and the integrity of the bar, the Court must suspend respondent from practicing law for two years.

Respondent also shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For Suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

## ORDER

It is ORDERED that **SAMUEL ASBELL** of **CAMDEN,** who was admitted to the bar of this State in 1969, is hereby suspended from the practice of law for a period of two years, effective June 6, 1994, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.