ANSTEAD, J.,
dissenting.
I would accept the Board’s recommendation for the very reasons articulated in the majority’s opinion, i.e., “we will approve the Board’s findings of fact when they are supported by competent substantial evidence in the record [and w]e also usually defer to findings based on a witness’s credibility.” Majority opinion at 508 (citations omitted). After paying lip service to these long-established principles, the majority first creates and then substitutes its own views in place of the findings of the Board that heard and considered the evidence firsthand. Unfortunately, the message we deliver to the Board today is that we will no longer defer to the Board’s findings on issues of fact and credibility. Because I conclude the majority fails to honor our precedent, I respectfully dissent.
To illustrate the degree of the majority’s deviation from precedent we need only to consider the short shrift the majority gives to the evidence of rehabilitation presented at the evidentiary hearing before the Board, compared to the extensive and comprehensive review of the evidence and findings by the Board. In a single brief paragraph, the majority first asserts that the Board found that evidence of “an extraordinary amount of community service” was presented at the hearing; the majority then, in effect, directly refutes this statement by characterizing the evidence presented as consisting only of the brief testimony of a legal aid attorney and paralegal. See majority opinion at 507-08.[3] In the balance of the opinion the majority essentially substitutes its view of the credibility and weight of the evidence and rejects the Board’s firsthand assessment.
The summary dismissal by the majority of the evidence presented to the Board stands in sharp contrast to the Board’s *513 extensive narration of this evidence in its findings:
Weighed against this disqualifying conduct is the extensive showing of rehabilitation presented by M.B.S. at his formal hearing. The Board concluded that M.B.S.’s showing of rehabilitation at the formal hearing clearly and convincingly established that he had rehabilitated himself from the disqualifying conduct.
The record establishes that M.B.S. suffered from alcoholism and a debilitating Obsessive-Compulsive Disorder (hereinafter “OCD”). M.B.S. first started exhibiting symptoms of OCD in 1986. M.B.S. describes how the OCD manifested itself in his Chronological Medical History (BE 3, Addendum A, pp. 1-2) M.B.S. provides an extensive description of all of the attempts to treat his OCD, both by way of counseling and medication. Id. Ultimately, M.B.S. started self-medicating by drinking alcohol. Id. at 3. M.B.S.’s use of alcohol increased to the point that he became alcohol dependent.
M.B.S. joined Alcoholics Anonymous in January 2004. (AE 2, p. 4) M.B.S. also executed a Florida Lawyers Assistance, Inc. contract on August 23, 2004. Id. M.B.S.’s sobriety date is April 12, 2004. (T 107; see also AE 23) Therefore, M.B.S. appeared at the formal hearing with 13 months of sobriety. As things stand now, were M.B.S. to be admitted conditionally with a three year period of probation as recommended by the Board, M.B.S. would have over five years of sobriety at the end of the conditional admission period, assuming he maintains his sobriety.
In addition to the steps taken by M.B.S. to address his substance addiction and his OCD, M.B.S. documented at the formal hearing an extraordinary amount of community service.
Sharon Bourassa, the director of special projects and litigation for Legal Aid in Broward County, Florida, testified by telephone. (T 19-20). Ms. Bourassa has known M.B.S. for two years. M.B.S. works in her unit under her supervision, and she knows M.B.S. both professionally and personally. (T-20-21)
M.B.S. interviews clients for Legal Aid, many of them former inmates and individuals on welfare. In addition, M.B.S. has done research for Ms. Bour-assa in a class-action case that will have significant impact concerning the support services available to the poor. (T 21) M.B.S. has also worked with Ms. Bourassa on a landfill case that impacts approximately 44,000 low income African Americans in the northwest section of Fort Lauderdale. (T 22)
In addition to working in their office, M.B.S. goes into the field and makes presentations on behalf of Legal Aid. Id. Ms. Bourassa trains her staff to not say “no” to people. M.B.S. has effectively absorbed that lesson, as he can relate to the type of clientele the Legal Aid office serves. (T 22-23)
Ms. Bourassa does not consider M.B.S. an intern anymore because of the work he has done and the amount of time he spends in the office. (T 23) M.B.S. has taken a lot of responsibility in the office, freeing up Ms. Bourassa and others to work on the class action case. (T 24) If Ms. Bourassa did not have M.B.S. working in her office, it would have a significant adverse impact on their ability to serve the clients they have. Id.
M.B.S. frequently advocates for the cases of certain clients to be taken. (T 25) Ms. Bourassa thinks M.B.S. will be very successful in criminal defense be *514 cause he can really relate to the clients. (T 26)
M.B.S. takes a very good holistic approach to helping the office’s inmate clients. Ms. Bourassa testified that many of these clients would have recidivism problems if they did not work to address all of the issues in the inmate’s life. Ms. Bourassa described M.B.S.’s involvement in Alcoholics Anonymous as “very zealous.” (T 30)
Ms. Bourassa also described a situation where M.B.S. went on a retreat at an abbey. M.B.S. loved the monks’ lifestyle because they were very supportive, but their lives were very regimented, and that was something that M.B.S. needs in his life. This has caused M.B.S. to try to learn more about the Catholic religion. (T 30-31)
Ms. Bourassa described M.B.S. as a person with a very good heart. (T 31) She used the analogy of watching him turn into a butterfly from being a caterpillar over the past two years. She has worked in this area for 23 years, but this is only the third time she has agreed to testify on someone’s behalf. Id.
Ms. Bourassa described M.B.S. as a person of honesty and integrity. Ms. Bourassa was asked specifically about M.B.S.’s truthfulness, in light of the lack of candor described in the Specifications that M.B.S. admitted. Ms. Bourassa testified that as dishonest as M.B.S. was during his alcoholism, he has now become almost overly honest in recovery. (T32)
Ms. Bourassa testified that if she had an opening right now, she would hire M.B.S., especially to work with inmates. (T 46) Ms. Bourassa has a close working relationship with the public defender’s office, and she intends to get M.B.S. a job in that office if he is admitted to the Bar. (See also AJE 8, a letter from Ms. Bourassa)
Nikki Elliott has worked in the legal field for 18 years, and has been a paralegal in the Broward County Legal Aid office for four years, and has worked closely with M.B.S. for the past two years. (T 51) Ms. Elliott described M.B.S. as very caring, considerate, honest, loyal, dedicated, motivated, and hard-working. (T 52)
Ms. Elliott reiterated some of the testimony of Ms. Bourassa, also describing how M.B.S. works doing intake for the office, going in to the jails to inform inmates of the services available, and going to schools to tell students of the different programs that are available. (T 53) Ms. Elliott testified that M.B.S. works harder than some of their paid employees. (T 54) Ms. Elliott described a situation where M.B.S. convinced their supervisor to take the case of an individual wrongly accused of trespassing, and, with M.B.S. doing most of the leg work for one of the Legal Aid attorneys, their office was able to have the conviction removed. (T 54-56)
Ms. Elliott also described how M.B.S. went beyond what would normally be expected to help other clients of their office, such as getting an ex-offender into culinary school, and giving a client one of M.B.S.’s suits so the client could wear it to a job interview. (T 56-58) Ms. Elliott testified they have never had a volunteer like M.B.S. (T 59) (See also AE 11, a letter from Ms. Elliott)
Jeremy Garrón is an inactive attorney in New Jersey who now works moving furniture in Florida. (T 65, 71) Mr. Garrón did not stop practicing law in New Jersey because of any disciplinary action against him, but rather to try to deal with his alcoholism. (T 70) Mr. Garrón is a member of Alcoholics Anon *515 ymous and has a sobriety date of February 17, 2004. (T 65-66) Mr. Garrón first met M.B.S. approximately 13 months prior to the formal hearing at an Alcoholics Anonymous meeting. (T 66) Mr. Garrón testified that M.B.S. was hostile when he first came to Alcoholics Anonymous. (Id.)
Sometime after first meeting M.B.S. at the meeting, Mr. Garrón was introduced to M.B.S. outside the meetings, and Mr. Garrón and M.B.S. started to do things together socially. (T 67) Mr. Garrón has seen M.B.S. change from the person who was hostile to someone who is genuinely involved with the Alcoholics Anonymous program.
Mr. Garrón knows that M.B.S. attends Alcoholics Anonymous meetings every day, sometimes two to three meetings a day. (T 67-68) Mr. Garrón has also shared some church involvement with M.B.S. (T 68-69) Finally, Mr. Garrón described the support group M.B.S. has in Alcoholics Anonymous. (T 69) (See also AE 68, a letter from Mr. Garrón)
Robert Farrell worked for Farrell Advertising for 39 years, and was the vice president of sales for different companies. Mr. Farrell is a member of Alcoholics Anonymous. (T 76) Mr. Farrell has known M.B.S. for 16 months. (T 77) Mr. Farrell and M.B.S. have slowly become friends, and they share the same sponsor in Alcoholics Anonymous. (Id)
Mr. Farrell and M.B.S. call each other all the time and have a strong bond of friendship. Id. In spite of M.B.S.’s relative young age, he has been able to help a lot of older people in Alcoholics Anonymous. Mr. Farrell estimated that 90 per cent of the time M.B.S. spends in the program is geared toward helping other people. (T 78) M.B.S. has started to sponsor someone else in the program. (T 79) Mr. Farrell also described M.B.S.’s support group, a group that includes Mr. Farrell. (T 80) (See also AE 69, a letter from Mr. Farrell)
Michael Ruane gave unsworn testimony by telephone. Mr. Ruane is a Florida licensed real estate broker and has been a member of Alcoholics Anonymous for 15 years. (T 84) Mr. Ruane first met M.B.S. through their mutual involvement with Alcoholics Anonymous. (T 85)
Mr. Ruane is M.B.S.’s sponsor in Alcoholics Anonymous. Mr. Ruane took M.B.S. through the 12 steps of the program fairly quickly. M.B.S. has also gotten involved in service work, chairs multiple meetings, and is the secretary of one group. Id.
M.B.S. goes to at least one Alcoholics Anonymous meeting a day, and sometimes attends more than one meeting a day. (T 86) M.B.S. has become a mainstay of the Boca Pines Club of Alcoholics Anonymous. Id. Mr. Ruane talks to M.B.S. a minimum of one time a day: if he does not see M.B.S. during the day, he speaks with him at night. (T 87) (See also AE 46, a letter from Mr. Ruane)
M.B.S. also testified at the formal hearing about his recovery from alcoholism and his community service. With regard to his service to Alcoholics Anonymous, M.B.S. has been secretary to one group, and is currently the treasurer of another group. M.B.S. has chaired multiple meetings. (T 91)
M.B.S. also described how his involvement with Alcoholics Anonymous has helped him turn his life around. (T 91-93) M.B.S. is in the process of being confirmed into the Catholic Church, and feels that his religion has helped his recovery because it gives him a much more concrete higher power that he recognizes is in control. (T 93)
*516 M.B.S. considers Ms work at Legal Aid as part of his recovery. (T 96-97) M.B.S. does not attend a lot of Alcoholics Anonymous meetings because he feels like drinking, but because he can help other people, and by helping them, he is helping himself. (T 97)
M.B.S. is heavily involved in a broad re-entry coalition, which attracted him through his work at Legal Aid. The list of community service organizations in which M.B.S. is involved includes The Dependency Division of the Seventeenth Judicial Circuit, Legal Aid of Broward County, Family, Inc., The Round Table Meetings of the Broward County Health and Rehabilitative Service Providers, The Broward County Re-entry Coalition for Ex-Offenders, Women in Distress, The Consortium of Faith-Based Organizations/Community-Based Organizations, The South Florida Human Rights Council, Neighbors for Neighbors — Rescue and Relief for Hurricanes Frances and Jeanne, judicial campaigns, Public Awareness Committee, Re-entry Summit Convention, making a presentation at Broward Success Institute, Operation Election Protection, American Civil Liberties Union, Elijah’s Fathering Ministry, meeting regarding North Broward Hospital District Policies, making a presentation at Broward Correctional Institute, Job Fair at Sheridan Tech, Trial Assistance, South Florida Human Rights Council Education Committee Meeting, T.J. Reddick Bar Association, and a meeting with State Attorney Michael J. Satz to discuss ways to reduce recidivism. (AE 2, pp. 5-8)
As this list would indicate, M.B.S. has, over the past two years, been committed on a full-time basis to performing community service. (T 116) He is able to do this in part because of gifts and/or loans from his parents and a Social Security disability he has been receiving for his OCD. (T 103-104)
M.B.S. testified that he now follows three rules: “if it is not mine, I don’t take it; if it is not true, I don’t say it; if it doesn’t feel right, I don’t do it.” (T 118)
In addition to the evidence described above, M.B.S. introduced into evidence some 72 exhibits, most being character letters. These exhibits also provided some documentary evidence of the extensive community service in which M.B.S. has engaged.
Response to Court Order at 19-28. Finally, again in stark contrast to the majority’s exclusive focus on the applicant’s misconduct, we must consider the Board’s conscientious attempt to carry out its responsibilities to evaluate both the extensive evidence of prior misconduct and the extensive evidence of rehabilitation:
The Board acknowledges the extensive misconduct described in the Specifications, and the serious questions this conduct raises in determining whether M.B.S. should be admitted to the Bar. It should be noted that the last time M.B.S. engaged in conduct that was disqualifying was in March 2003 (over two years prior to the formal hearing) when he provided some information on his Florida Bar Application that was false, misleading, or lacking in candor. Since that time, through two appearances before the Board for his investigative and formal hearings, M.B.S. has displayed absolute candor.
The Board was impressed with the extent of rehabilitation established by M.B.S. at his formal hearing. This was proven through documentary evidence, testimony of character witnesses, and the testimony of M.B.S. himself. The Board also acknowledges the high regard in which M.B.S. is held by those *517 who testified on his behalf. The extent of M.B.S.’s involvement in the community is among the most impressive seen by the Board from an applicant attempting to establish rehabilitation.
The Board had the opportunity to observe the demeanor of M.B.S., and to evaluate his credibility. The Board was convinced that M.B.S. was credible, and the Board was further impressed with M.B.S.’s changed attitude about how he conducts himself.

CONCLUSION

M.B.S. appeared before the Board presenting what could be considered a classic case of extensive and serious disqualifying conduct that needed to be weighed against an impressive showing of rehabilitation. M.B.S. certainly had a very heavy burden to establish his rehabilitation considering the pervasive and serious nature of the disqualifying conduct found proven in the Specifications. As observed by the Supreme Court of New Jersey, “[a]n applicant’s attitude and behavior subsequent to disqualifying misconduct must demonstrate a reformation of character so convincingly that it is proper to allow admission to a profession whose members must stand free from all suspicion.” Application of Matthews, [94 N.J. 59] 462 A.2d 165, 176 (N.J.1983).
The Board ultimately concluded that M.B.S. has undergone this reformation of character, and that he clearly and convincingly established that fact at the formal hearing. The Board’s recommendation for a conditional admission for three years provides a further safeguard and check to ensure M.B.S. conducts himself properly as a member of the Bar. The Board respectfully requests that the Court affirm the Board’s recommendation of a conditional admission for M.B.S.
Response to Court Order at 28-30. Because I conclude the Board has correctly and conscientiously carried out its responsibilities I would approve the Board’s findings and recommendation.

. Consider the majority’s dismissal of the case presented by the applicant compared to the extensive findings of the Board:
According to the Board, M.B.S. documented an extraordinary amount of community service. The director of special projects and litigation for Legal Aid in Bro-ward County, Florida, Sharon Bourassa, testified on M.B.S.’s behalf by telephone. Bourassa has known M.B.S. for two years. M.B.S. performed volunteer work under Bourassa’s supervision. M.B.S. interviewed clients and did research for Bouras-sa in at least two cases. He also went into the field to make presentations on behalf of Legal Aid. Bourassa testified that if she had an opening, she would hire M.B.S., especially to work with inmates. A paralegal in the same office also testified on M.B.S.’s behalf and testified to M.B.S.'s hard work and caring and considerate attitude in dealing with clients.
Majority opinion at 507-08.